# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 24, 2012       Decided May 7, 2013

No. 11-7136

JUDITH BARNETT,
APPELLANT

v.

PA CONSULTING GROUP, INC.,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:04-cv-01245)

*Richard A. Salzman* argued the cause for appellant. With him on the briefs was *Douglas B. Huron*.

*Elizabeth Lalik* argued the cause for appellee. With her on the brief was *Scott J. Preston*.

Before: GRIFFITH, *Circuit Judge*, EDWARDS and SENTELLE, *Senior Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: Judith Barnett appeals the district court's grant of summary judgment against her claims

that she was fired from her work because of her age and sex. The district court credited the defense of Barnett's employer that she was let go during a restructuring of the firm only because her expertise was not a good fit with the firm's new business focus. Viewing the facts in the light most favorable to Barnett, we conclude that a reasonable jury could find her employer's defense to be pretext for discrimination, and reverse.

I

Defendant PA Consulting Group, Inc. (PA), is a management consulting firm headquartered in London, with offices in approximately thirty countries, including the United States. The firm is organized into industry-specific practice groups led by partners who supervise managing consultants, principal consultants, and support staff.

From 2000 until 2003, Barnett worked as a managing consultant in the firm's Transportation Group, which mainly advised clients in the airline industry. Unlike most of her colleagues in the Group, Barnett's book of business was not focused on airlines and airports. Instead, she worked with a range of American companies seeking to open new markets for their products in the Middle East and North Africa. Barnett's practice grew out of her prior work in government. From 1994 through 1998, she served as Deputy Assistant Secretary of Commerce for the Middle East and Africa. Upon leaving government service in 1998, Barnett joined GKMG, a small firm whose other consultants chiefly advised airlines hoping to open new routes and airports looking for additional carriers. GKMG brought Barnett on board to diversify its business and help expand its presence in the Middle East. In 1999, Barnett and her colleagues at GKMG merged with Hagler Bailly and became that firm's Transportation Group. When PA purchased

Hagler Bailly in the fall of 2000, the former GKMG consultants, including Barnett, became the new Washington-based Transportation Group at PA. For a few months after joining PA, Barnett sought to switch into a different practice group, because she was concerned that her expertise was out of sync with the Transportation Group's focus on the airline industry. But James Miller, the head of the Group, convinced her to stay. Miller told Barnett that she was doing great work, making lots of money for the firm, and on track for promotion.

Barnett continued to impress her bosses at PA and received favorable performance reviews. For example, her June 2003 review, written by Miller, described her overall performance as "very good!" In his deposition testimony, Miller remembered Barnett as a "tireless" consultant who "produced great work for the client." The percentage of her work billed to clients was higher than that of any other managing consultant in the Transportation Group.

Nevertheless, Barnett found herself part of a failing practice. Financial turmoil befell the aviation industry in the wake of the 9/11 terrorist attacks. Because PA's Transportation Group primarily served airlines and airports, its revenues plummeted in 2002. By early 2003, the Group was losing millions of dollars a year. PA's top management in London, led by its chief executive officer Jon Moynihan and its chief operating officer Bruce Tindale, stepped in to try to pull the Group out of its tailspin. First, they commissioned an internal audit, completed in January 2003, which confirmed that the Transportation Group had too many employees billing too few hours to clients. The audit recommended laying off those who were not covering their costs. Next, Moynihan and Tindale convened a series of meetings of PA executives to discuss how

best to address the Group's woes. Those meetings took place in February, April, and twice in September 2003.

Two major decisions emerged from the audit and meetings. First, effective at year's end, the Transportation Group would merge into the more successful Information Technology Infrastructure Group, which would continue to be led by PA partner Patrick Kelly. And second, not all of the members of the Transportation Group could be retained. Some would need to be fired. Firings in the Transportation Group had already begun in early 2003, when Miller terminated a managing consultant and a principal consultant who he determined were unlikely to generate significant new revenue. During the September 2003 meetings, Miller identified four more employees – two consultants and two support staff – who could be fired immediately. The meeting participants also discussed trimming the Group's work in China, including closing its office in Beijing. Nobody suggested firing Barnett.

To carry out the reduction in force, Kelly met with Miller on September 30 to discuss each member of the Transportation Group. Kelly and Miller produced a chart that rated each of the Group's employees in three areas: "Skill and Capability," "Performance," and "Commitment to PA." Barnett received the highest possible rating, three check marks, for her "Performance" and her "Commitment to PA." According to Kelly, "Skill and Capability" was meant to reflect "how valuable [the employee's] skill set was, how relevant it was to what we're trying to sell in the marketplace" relative to the work of the Transportation Group. Barnett received two check marks in the "Skill and Capability" category, with an accompanying note: "Trade." Significantly, another of the Transportation Group's managing consultants, George Gao, who worked out of both the Washington and Beijing offices, earned similar, but less impressive, ratings: two checks for

"Skill and Capability" and "Performance," and three checks for "Commitment to PA." Like Barnett, Gao received a note next to his "Skill and Capability" rating: "China." According to Miller, Gao's consulting practice was "very China-focused" with minimal capabilities and experience in the aviation industry. Gao was forty-one years old.

Immediately following the September 30 meeting, Kelly, who was now in charge of personnel matters for the Transportation Group, accepted Miller's recommendation to fire the four employees he had named. Miller directed Michael Fleming, a Transportation Group managing consultant, to draft a memorandum describing why Miller and Kelly had chosen to fire these employees. The memorandum, received by Miller and Kelly on October 7, states that the Group "had to downsize and eliminate non-core activity . . . to align more closely with the needs of the aviation market . . . ." The Group would henceforth emphasize six "focus propositions": (1) "Airport privatization"; (2) "Airport air service development"; (3) "Airport transformation"; (4) "Airline route profitability"; (5) "Airline labor"; and (6) "Airline transformation."

On October 10, Kelly met individually with senior members of the Transportation Group, including Barnett. Kelly testified that "the purpose of the meeting[s] was just to get to know people a little bit, get to know their views on what we needed to make a success of the unit." Kelly met with Barnett for about fifteen minutes. By October 16, Kelly had added her to the list of those to be fired. According to Kelly, he did so because Barnett's practice was not focused on the aviation industry and thus fell outside the six "focus propositions" that would govern the Group's work going forward. An updated version of the October 7 memorandum, dated October 16, is essentially unchanged except to include Barnett on its list of layoffs for the first time. The October 16

memorandum describes Barnett's practice as a "non-core activity" and "essentially a standalone offering," and concludes that "Barnett does not have the skills necessary . . . to support our current propositions, and therefore, cannot be utilized within the practice." PA fired Barnett and the four other employees on October 17. Barnett was fifty-seven years old at the time.

Although PA closed its Beijing office in November 2003, Gao remained at PA. Kelly reached an accommodation with Ken Rubin, head of a practice group focused on international development, that Gao would split his time between Kelly's group and Rubin's. Kelly asked Rubin whether Barnett could transfer into his group, but when Rubin balked at the idea, Kelly dropped it. Kelly never proposed to Rubin the idea of splitting Barnett's work between their two groups, the accommodation reached for Gao.

Barnett filed suit against PA on April 1, 2004, alleging age and sex discrimination in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-634, and the District of Columbia Human Rights Act (DCHRA), D.C. Code § 2-1402.11. Following discovery, PA moved for summary judgment, which the district court granted. *Barnett v. PA Consulting Grp., Inc.*, 818 F. Supp. 2d 159 (D.D.C. 2011). We have jurisdiction over Barnett's appeal pursuant to 28 U.S.C. § 1291.

II

We review a grant of summary judgment de novo. *See, e.g.*, *Salazar v. Wash. Metro. Area Transit Auth.*, 401 F.3d 504, 507 (D.C. Cir. 2005). Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment. Thus, we do not determine the truth of the matter, but instead decide only whether there is a genuine issue for trial." *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010) (internal quotation marks and citations omitted).

We consider Barnett's age and sex discrimination claims in the same way we analyze Title VII claims. *See Vatel v. Alliance of Auto Mfrs.*, 627 F.3d 1245, 1246 (D.C. Cir. 2011) (DCHRA); *Ford v. Mabus*, 629 F.3d 198, 201 (D.C. Cir. 2010) (ADEA). "Once an employer has offered a legitimate reason for an employee's dismissal, the question at the summary judgment stage is whether the employee has 'produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee'" on the basis of, in this case, age or sex. *Vatel*, 627 F.3d at 1246 (quoting *Brady v. Office of the Sergeant of Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008)). To answer this question, we look to see if there is evidence from which a reasonable jury could find that the employer's stated reason for the firing is pretext and any other evidence that unlawful discrimination was at work. *See, e.g.*, *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) .

According to PA, Kelly fired Barnett because her consulting practice did not fit the firm's plans to narrow the work done by the Transportation Group to the six "focus propositions" set forth in the October 16 memorandum, all linked to "airports and airlines in business development." Kelly denies considering any other factor in firing Barnett. We

must determine whether a reasonable jury could conclude this explanation is pretext.

Of course, we are conscious that a court must not act as "a super-personnel department that reexamines an entity's business decisions[.]" *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008) (citation omitted). PA was entitled to restructure the Transportation Group to return it to profitability and to fire people to do so. PA was also entitled to fire Barnett if Kelly believed that her consulting practice did not "fit" within the restructured Group. But there is evidence in the record from which a reasonable jury could conclude that lack of "fit" was not why PA fired Barnett, and that unlawful discrimination was. Summary judgment is inappropriate where, as here, the most significant disputes between the parties are factual in nature. *See Pardo-Kronemann*, 601 F.3d at 604.

The most important factual dispute is why PA fired the fifty-seven year-old female, Barnett, but retained the forty-one year-old male, Gao. Different outcomes for Barnett and Gao matter because in nearly all respects material to PA's explanation, Gao was similarly situated to Barnett. The most significant differences between the two are that Gao is male and younger than Barnett. Those are differences a jury should be allowed to consider.

The record is replete with evidence that PA partners, including Kelly, believed that Gao's consulting practice did not "fit" in the Transportation Group. In the September 30 chart created by Miller and Kelly, both Barnett and Gao received two check marks out of a possible three in the "Skill and Capability" rating. Each also received an accompanying notation: "Trade" in Barnett's case, and "China" in Gao's. According to Miller, these ratings meant that Barnett and Gao

both had strong skills in their respective areas of expertise – trade and China – but that neither was likely to make meaningful contributions to the Group's focus on the aviation industry.

There is further evidence that could lead a jury to believe that Kelly thought Gao no longer "fit" within the Transportation Group. Miller testified that he had the "same discussion" with Kelly about Gao as he did about Barnett, and that Kelly was "pretty much of the mind that [Barnett and Gao] were going to move" out of his group. But Kelly worked out an accommodation with Rubin to split Gao's time and salary "50-50" between their practice groups. By contrast, no one proposed splitting Barnett's salary or making any similar arrangement to keep her at PA. And there is no evidence that China, Gao's niche, would be part of the Transportation Group's focus going forward. To the contrary, the decision to close the Beijing office is evidence that PA had decided to reduce the Group's China operations.

According to Miller, Kelly was "very clear that he wanted to make sure [Barnett] was out of the practice." If "fit" in the Transportation Group was the sole motivating factor in Barnett's firing, a jury could reasonably question why Kelly was not similarly adamant that Gao leave the group entirely. At the very least, the efforts Kelly took to keep Gao at PA could raise a reasonable inference that "fit" was not the sole reason Barnett lost her job, and that PA partners found a way to keep a younger male consultant at the firm whose practice did not fit neatly into its new plans.

PA makes three arguments why Gao's retention could not lead any reasonable jury to find pretext. First, PA points to Kelly's deposition testimony that Gao took a pay cut to stay. Kelly's testimony, however, clashes with record evidence, a

document prepared by human resources staff at the firm in early 2003, that suggests Gao's salary remained constant. Whether Gao suffered adverse professional consequences from the restructuring is a classic question of fact for the jury. PA also argues that Gao's practice was marginally more profitable than Barnett's in 2003. But Kelly testified that profitability had nothing to do with Barnett's termination, and there is no evidence in the record to support PA's claim that profitability played any role in the decision to keep Gao.

Finally, PA speculates that Kelly may have offered to split Gao's salary with Rubin because Gao "had transportation experience" but Barnett did not. Appellee's Br. at 57. PA cites Gao's 2002 performance appraisal, which lists several projects Gao worked on that appear to be related to airports and the airline industry. But Miller, the partner who completed Gao's 2002 performance appraisal, also testified that Gao "was very China-focused. He had capabilities in aviation but *really very, very small, still in the learning phase*." (Emphasis added). Besides, Barnett had similar aviation industry experience. She had worked on a project for Khalifa Airlines, an Algerian carrier. Of course, a jury could choose to credit PA's argument that its partners considered Gao's aviation industry experience to be meaningfully distinguishable from Barnett's. The issue, however, cannot be resolved at summary judgment.

In addition to the disputed facts regarding PA's treatment of Gao, a jury could rely upon other record evidence to discredit the firm's explanation for firing Barnett. PA makes much of Kelly's broad mandate to restructure the ailing Transportation Group and "make it profitable" by limiting its focus to the airline industry. Appellee's Br. at 2. But PA acknowledges that the four other employees fired on October 17 were let go for other reasons. Miller had determined they were unlikely to bring in sufficient revenues or they presented

redundancies. Barnett, it turns out, seems to be the only employee PA terminated for lack of fit.

Barnett's evidence rebutting PA's explanation is sufficient to warrant reversal because "a factfinder's disbelief of the reasons put forward by the defendant may support an inference of intentional discrimination." *Hamilton*, 666 F.3d at 1351 (internal quotation and citation omitted). Although "we do not routinely require plaintiffs to submit evidence over and above rebutting the employer's stated explanation in order to avoid summary judgment," *id.* (citation omitted), Barnett has done that here. She has introduced evidence that PA unlawfully considered age to be a relevant factor in deciding which Transportation Group employees to retain. Barnett points to a spreadsheet produced by COO Tindale's secretary in February 2003 for Tindale and CEO Moynihan in advance of the first meeting they convened about the Group. The spreadsheet includes comments from the authors of the internal audit about the productivity of each employee in the Group. The spreadsheet also reports the age of each employee, including Barnett.

Neither Moynihan nor Tindale could recall why ages were part of the spreadsheet, and PA asserts that there is no evidence of a link between the spreadsheet and Barnett's firing. Kelly testified that he did not see the spreadsheet and made the decision to fire Barnett on his own, without any prodding from Moynihan or Tindale. The district court determined the spreadsheet "irrelevant" to Barnett's discrimination claims, because "Kelly, alone, made the decision to terminate Ms. Barnett," and credited Kelly's testimony that his decision to fire Barnett was not influenced by Moynihan and Tindale. *Barnett*, 818 F. Supp. 2d at 170.

The district court was too quick to resolve this issue in PA's favor. A reasonable jury could find the spreadsheet to be probative of discrimination, because the jury might infer that PA's leadership included age as a factor in its personnel decisions. A jury could likewise refuse to credit Kelly's testimony that he did not consult with Moynihan and Tindale on firing decisions in October 2003, given evidence that PA's CEO and COO led meetings discussing which Transportation Group employees to fire only a few weeks before.

Of course, a reasonable jury could draw the inference that including ages in the spreadsheet was a one-off case of mistaken initiative by the secretary. But so could it reasonably infer that Moynihan and Tindale wanted ages in the spreadsheet to help PA leadership decide whom to fire and whom to keep. Barnett was entitled to all reasonable inferences in her favor to be drawn from the record evidence. *See Salazar*, 401 F.3d at 507. By resolving these fact-bound questions in PA's favor, the district court committed error.

## III

For the foregoing reasons, we reverse the judgment of the district court and remand for further proceedings.

*So ordered.*