**Judith BARNETT, Plaintiff**

v.

**PA CONSULTING GROUP, INC., Defendant.**

**Civil Action No. 04–1245 (BJR)**

United States District Court, District of Columbia.

Signed February 28, 2014

14

Douglas B. Huron, Richard A. Salzman, Katherine Wallat, Heller, Huron, Chertkof, Lerner, Simon & Salzman, Washington, DC, for Plaintiff.

Elizabeth A. Lalik, Thomas J. Flaherty, Littler Mendelson, P.C., McLean, VA, Lindsey H. McGinnis, Littler Mendelson, P.C., Washington, DC, for Defendant.

## ORDER REGARDING PRETRIAL MOTIONS

Barbara Jacobs Rothstein, U.S. District Court Judge

### I. INTRODUCTION

Plaintiff Judith Barnett (hereinafter "Plaintiff") brought this lawsuit against Defendant PA Consulting Group, Inc. (hereinafter "PA" or "Defendant"), alleging age and gender discrimination in violation of the Age Discrimination in Employment Act ("ADEA") and the District of Columbia Human Rights Act ("DCHRA"). The matter is set for trial before a jury beginning on March 12, 2014. The following matters are currently before the Court:

1. Defendant's Motion *in Limine* to exclude certain evidence pertaining to some of Plaintiff's damage claims and to exclude certain documents related to Plaintiff's termination (Dkt. No. 79);

2. Defendant's Motion *in Limine* to exclude two of Plaintiff's former co-workers, Anita Mosner and Edmund Pinto, as witnesses at trial (Dkt. No. 95);

3. The parties' submissions on whether, George Novak, another one of Plaintiff's former co-workers, should be permitted to testify at trial (Dkt. Nos. 94 and 96); and

4. The parties' submissions on whether back pay damages should be calculated using the "periodic" or "aggregate" method and whether an award of such damages is within the sole discretion of this Court (Dkt. Nos. 90, 97, and 99).

Having reviewed the pleadings, as well as the relevant legal precedent, this Court:

1. DENIES Defendant's Motion *in Limine* to exclude certain evidence related to Plaintiff's damage claims and certain documents related to Plaintiff's termination (Dkt. No. 79);

2. GRANTS Defendant's Motion *in Limine* to exclude Mosner as a witness and takes under advisement the motion with respect to Pinto (Dkt. No. 95);

3. GRANTS Defendant's request to exclude Mr. Novak's lay opinion testimony (Dkt. No. 96); and

4. FINDS that the "periodic" method of calculation is the proper method

for calculating back pay damages and either a judge or jury may award such damages for DCHRA and/or private sector ADEA claims. The reasoning for this Court's determinations is set forth below.

## II. LEGAL STANDARD

 Motions *in limine* are designed to narrow the evidentiary issues at trial. *Williams v. Johnson*, 747 F.Supp.2d 10, 14 (D.D.C.2010). The Federal Rules of Evidence generally permit the admission of "relevant evidence"—*i.e.*, evidence having "any tendency" to make the existence of any fact of consequence more probable or less probable—provided it is not otherwise excluded by the Rules, the Constitution, or an Act of Congress, and its probative value is not "substantially outweighed" by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or the needless presentation of cumulative evidence. *Id.* (citing Fed. R. Evid. 401–03). However, "[f]actual questions should not be resolved through motions *in limine*." *Graves v. District of Columbia*, 850 F.Supp.2d 6, 11 (D.D.C.2011) (quoting *Goldman v. Healthcare Mgmt. Sys., Inc.*, 559 F.Supp.2d 853, 871 (W.D.Mich.2008)). Nor is a motion *in limine* a "vehicle for a party to ask the Court to weigh the sufficiency of the evidence." *Id.* (quoting *Bowers v. Nat'l Collegiate Athletic Ass'n*, 563 F.Supp.2d 508, 532 (D.N.J.2008)). Rather, parties should target their arguments to demonstrating why certain items or categories of evidence should (or should not) be introduced at trial, and direct the trial judge to specific evidence in the record that would favor or disfavor the introduction of those particular items or categories of evidence. *Id.* (citing *U.S. ex rel. El-Amin v. George Washington Univ.*, 533 F.Supp.2d 12, 19 (D.D.C.2008)). In short, motions *in limine* are a means for arguing

why "evidence should or should not, *for evidentiary reasons*, be introduced at trial." *Williams*, 747 F.Supp.2d at 18 (emphasis in original).

 Trial judges are afforded broad discretion in rendering evidentiary rulings. *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 384, 128 S.Ct. 1140, 170 L.Ed.2d 1 (2008) (noting that deference is owed to trial judges due to their familiarity with the case and greater experience in evidentiary matters). The trial judge's discretion extends not only to the substantive evidentiary ruling, but also to the threshold question of whether a motion *in limine* presents an evidentiary issue that is appropriate for ruling in advance of trial. *Graves*, 850 F.Supp.2d at 11 (citing *United States v. Valencia*, 826 F.2d 169, 172 (2d Cir.1987)); accord *United States v. Layton*, 720 F.2d 548, 553 (9th Cir.1983), *cert. denied*, 465 U.S. 1069, 104 S.Ct. 1423, 79 L.Ed.2d 748 (1984), and overruled on other grounds by *United States v. W.R. Grace*, 526 F.3d 499 (9th Cir.2008). The trial judge has the "discretion to rule *in limine* or to await developments at trial before ruling." *Graves*, 850 F.Supp.2d at 11 (citing Stephen A. Saltzburg *et al.*, FEDERAL RULES OF EVIDENCE MANUAL § 103.02[13] (9th ed.2006)).

## III. DISCUSSION

### A. Defendant's First *Motion in Limine*

In its first motion *in limine*, Defendant moves this Court for an order prohibiting Plaintiff from offering evidence or argument before the jury regarding the following:

 i. Plaintiff's assertion that she would have been promoted to Partner had she not been terminated from PA;

ii. Expert testimony or other evidence related to Plaintiff's alleged damages had she been promoted to Partner at PA;

iii. Plaintiff's claims for punitive and liquidated damages;

iv. A 2003 internal audit report and/or a 2003 spreadsheet titled "View of TP Staff";

v. An email string dated October 7, 2012 between, among others, Annette Wigton and Jon Moynihan; and

vi. PA's net worth and financial condition.

Dkt. No. 79 at 1–2. The Court will address these evidentiary matters below.

**1. Evidence Regarding Plaintiff's Potential for Being Promoted to Partner at PA If She Had Not Been Terminated and Evidence Pertaining to Plaintiff's Alleged Damages Had She Been Promoted to Partner**

■ Plaintiff contends that she would have been promoted to Partner at PA had she not been terminated in 2003, and that she should be awarded back and front pay damages premised upon partnership compensation levels since the date of her termination. PA argues that Plaintiff should be prohibited from making this argument because, in PA's view, the undisputed evidence demonstrates that Plaintiff did not meet the "objective standards" necessary to be "promoted to Partner at PA in 2005 or 2006 or anytime thereafter." Def.'s Mot. at 4. According to PA, "[t]here is no record evidence upon which a reasonable fact-finder could conclude that [Plaintiff] would have" been promoted to Partner. *Id.*

The Court finds Defendant's argument unpersuasive. At the time that Plaintiff was terminated, she was a Managing Con-

sultant, one level below that of Partner. Pl.'s Opp. at 6. Evidence in the record demonstrates that Plaintiff's direct supervisor, James Miller, thought Plaintiff "was doing great work, making lots of money for [PA], and on track for promotion." *Barnett v. PA Consulting Group, Inc.,* 715 F.3d 354, 356 (D.C.2013). In her 2002 review, Miller described Plaintiff's overall performance as "very good!", and in his deposition testimony, Miller remembered Plaintiff as a "tireless" consultant who "produced great work for the client." *Id.* Plaintiff has also presented evidence that her approval ratings and evaluations were as good as a fellow member of the Transportation team, Peter Siggins, who was eventually promoted to Partner at PA.

■ Nevertheless, PA argues that the record evidence demonstrates that "[Plaintiff] never came close to meeting the minimum prerequisites for promotion to Partner" and any claims otherwise "ignore reality." Def.'s Mot. at 4. PA's argument ignores the evidence Plaintiff has presented, evidence that creates a question of fact as to whether Plaintiff would have been promoted to Partner. Such a question of fact is for the jury to resolve, not this Court. *See, e.g., Graves,* 850 F.Supp.2d at 11 (D.D.C.2011) ("Factual questions should not be resolved through motions *in limine.*"); *C & E Servs., Inc. v. Ashland, Inc.,* 539 F.Supp.2d 316, 323 (D.D.C.2008) (a motion *in limine* should not be used to resolve factual disputes or weigh evidence). Because PA has not established that evidence regarding Plaintiff's potential promotion to Partner would mislead or confuse the jury, or be unduly prejudicial to PA, the Court will not exclude such evidence.

■ Next, PA argues that Plaintiff should be prohibited from offering expert testimony and opinion or other evidence related to her claim for damages based on

18

Partner-level compensation. In support of her claim for past and future wage damages, Plaintiff retained Richard B. Edelman, PhD to perform calculations of her lost wages and future earnings loss allegedly arising from her termination. Dr. Edelman prepared his initial report on January 9, 2005, and his supplemental report was produced on January 10, 2014. In his supplemental report, Dr. Edelman provides his projection of Plaintiff's lost earnings and benefits under two non-termination scenarios: (1) Plaintiff remained a Managing Consultant at PA, and (2) Plaintiff was promoted to Partner at the beginning of 2006. Under the first scenario, Dr. Edelman opines that Plaintiff has no lost wages or benefits to-date and will accrue earnings and benefits losses of approximately $48,000 between now and 2020, when he expects Plaintiff to retire. Under scenario two, Dr. Edelman opines that Plaintiff sustained losses of approximately $728,000 to-date and will have almost $2.55 million in lost earnings and benefits by 2020.

PA asserts that there are two major flaws in Dr. Edelman's analysis, rendering it unreliable and inadmissible under *Daubert* and Rule 702. Def.'s Mot. at 10. "First, Dr. Edelman estimated Plaintiff's lost earnings by assuming that Plaintiff would quickly make Partner, despite her weak revenue generation record. Second, he assumed that her earnings would immediately match the earnings of one of the most successful and highly compensated partners in [PA's United State's offices] promoted since 2006." *Id.* PA argues that Dr. Edelman ignores or otherwise fails to account for "Plaintiff's dramatically sub-par financial performance during her career at PA, or the negative impact this fact would have on her realistic potential for promotion and the timing of promotion." *Id.* PA further asserts that Dr. Edelman "ignore[s] the predictive import of [Plaintiff's] past performance with respect to her likely financial performance if she somehow made Partner, as well as its impact upon her resulting compensation." *Id.* Therefore, PA argues, Dr. Edelman's testimony and supplemental report should be excluded from evidence at trial to the extent that they relate to Plaintiff's alleged damages based on her potential promotion to Partner.

Here, PA does not challenge the methodology employed by Dr. Edelman; rather, PA challenges the assumptions that Dr. Edelman made in his analysis. This is not a sufficient basis on which to prohibit his testimony. As the Supreme Court aptly stated in *Daubert*, "vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Courts in this district routinely permit expert testimony based on assumptions of fact and "shaky evidence," so long as the underlying methodology used is valid. *See, e.g., Groobert v. President & Directors of Georgetown College*, 219 F.Supp.2d 1, 10–11 (D.D.C.2002) (noting that the question of plaintiff's future career plans could not be answered with absolute certainty and, thus, the issue was properly left to the trier of fact); *Freeland v. Iridium World Commc'ns, Ltd.*, 545 F.Supp.2d 59, 88–89 (D.D.C.2008) ("Motorola may cross-examine [expert witness] about the factual basis of his opinions, but its disagreement with that factual basis does not affect the testimony's admissibility."); *Butera v. District of Columbia*, 83 F.Supp.2d 25, 35 (D.D.C.1999) aff'd in part, rev'd in part, 235 F.3d 637 (D.C.Cir. 2001) ("Defendants state that Dr. Edelman's testimony was speculative because

the lost-future-earnings prediction was not based upon [plaintiff's] work history. That argument, however, goes to weight rather than admissibility of the testimony"); *see also, Coles v. Jenkins,* 1998 WL 964506, at *4 (W.D.Va. Dec. 22, 1998) (holding that expert testimony was necessarily predicated on some assumptions regarding how long the plaintiff would have lived and continued working since those questions "cannot be definitively answered" and are better addressed by allowing cross-examination at trial).

 The authority on which PA relies to exclude Dr. Edelman's testimony is easily distinguishable. In *Elcock v. Kmart Corp.,* 233 F.3d 734 (3d Cir.2000), the Third Circuit excluded an economist's opinion regarding lost future income in a slip and fall case because the economist's projections were based upon an assumption of 100% disability in the future, when the plaintiff's own vocational expert had found that she was only 50–60% disabled. Similarly, in *Irvine v. Murad Skin Research Labs., Inc.,* 194 F.3d 313, 320–21 (1st Cir.1999), the First Circuit ordered a new trial because the expert's testimony regarding damages was based on the assumption that the product at issue comprised 100% of the plaintiff's net business income even though plaintiff's own contemporaneous records reflected that the product comprised less than 20% of sales. These cases stand for the unremarkable proposition that an expert witness's testimony should be excluded as unreliable if it is based on assumptions that are contradicted by his or her party's own evidence. In contrast, here, a reasonable jury could conclude that Plaintiff was on track for partnership and the compensation associated with partnership. Accordingly, this Court will not exclude Dr. Edelman's testimony regarding Plaintiff's alleged damages based on her potential promotion to Partner at PA.

## 2. Plaintiff's Punitive and Liquidated Damages Claims and Evidence Regarding PA's Net Worth

PA argues that Plaintiff should be prohibited from presenting evidence in support of her claims for punitive and liquidated damages because she cannot show the requisite "willfulness," "evil motive or actual malice" as required under the District of Columbia Human Rights Act ("DCHRA") and the federal Age Discrimination in Employment Act ("ADEA"). Def.'s Mot. at 11. Plaintiff counters that there is clear and convincing evidence that PA acted with the requisite malice. In Plaintiff's view, "two [of] the highest-ranking officials in PA" were involved in PA's discriminatory actions against Plaintiff, and both of these individuals "lied" to conceal their unlawful motive. Pl.'s Opp. at 4. Plaintiff also points out that the D.C. Circuit has approved of the use of a special interrogatory to the jury on the issue of the state of mind required for punitive damages ("Do you find by clear and convincing evidence that [defendant's] actions in terminating [plaintiff] were undertaken recklessly, maliciously, wantonly, and/or in reckless disregard to [plaintiff's] rights under the [DCHRA]?"). *See Howard University v. Wilkins,* 22 A.3d 774, 782–82 (D.C.2011).

The Court finds that at this stage, before the trial has commenced, the Court's determination of whether PA acted with the requisite malice would be premature. Therefore, the Court will deny PA's motion without prejudice as to the issue of punitive and liquidated damages, and will permit PA to revisit the issue, if necessary, at the appropriate juncture. *See Luce v. United States,* 469 U.S. 38, 41, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984) (denial of a

motion *in limine* does not guarantee that the evidence will be admitted at trial, and the court will hear objections to such evidence as they arise at trial). In addition, if the issue of punitive damages does go to the jury, the Court will permit Plaintiff to present evidence of PA's net worth. *See Woodner Co. v. Breeden*, 665 A.2d 929, 941 (D.C.1995) (under District of Columbia law, net worth is an element of punitive damages that the jury may consider).

### 3. The Spreadsheet, 2003 Internal Audit, and Email String dated October 17, 2003

 PA moves to exclude a spreadsheet titled "View of TP Staff" and a 2003 internal audit report because they are documents of which Mr. Kelly (who, according to PA, was the decision-maker in this case) was unaware and did not consider in reaching the decision to terminate Plaintiff. Def.'s Mot. at 13. This argument requires little discussion as the D.C. Circuit has already determined that these documents are relevant:

> A reasonable jury could find the spreadsheet to be probative of discrimination, because the jury might infer that PA's leadership included age as a factor in its personnel decisions. A jury could likewise refuse to credit Kelly's testimony that he did not consult with Moynihan and Tindale on firing decisions in October 2003, given evidence that PA's CEO and COO led meetings discussing which Transportation Group employees to fire only a few weeks before.
>
> Of course, a reasonable jury could draw the inference that including ages in the spreadsheet was a one-off case of mistaken initiative by the secretary. But so could it reasonably infer that Moynihan and Tindale wanted ages in the spreadsheet to help PA leadership decide whom to fire and whom to keep. Barnett was entitled to all reasonable infer-

ences in her favor to be drawn from the record evidence.

*Barnett*, 715 F.3d at 446. While the D.C. Circuit did not specifically address the 2003 audit, the audit was completed around the same time as the spreadsheet and was allegedly reviewed by the same individuals. As such, this Court finds that the Circuit Court's reasoning applies to the 2003 audit as well.

As for the email string dated October 17, 2003, PA argues that it should be excluded because it "was drafted *after* the decision [to terminate Plaintiff] was made, *after* the decision was communicated to [Plaintiff], and was drafted by Mr. Moynihan, who all of the undisputed facts demonstrate was not a decision-maker." Def.'s Mot. at 15 (emphasis in original). Therefore, in PA's view, the email "has nothing to do with the decision" to terminate Plaintiff and is "completely immaterial." *Id.* at 16. PA's argument is contradicted by the D.C. Circuit's determination that the "jury could . . . refuse to credit Kelly's testimony that he did not consult with Moynihan and Tindale on firing decisions." *Barnett*, 715 F.3d at 361. The email string is relevant and will be admitted.

### B. Defendant's Second Motion *in Limine*

In its second motion *in limine*, Defendant seeks to exclude the testimony of two of Plaintiff's former co-workers: Anita Mosner and Edmund Pinto. Dkt. No. 95. By a separate submission, Defendant also moves to exclude another former co-worker, George Novak, from testifying. Dkt. No. 96. The Court will address each of these in turn below.

#### 1. George Novak

 Mr. Novak was a Principal Consultant who worked in the Transportation Group with Plaintiff for roughly ten

years. Dkt. No. 94 at 2. Plaintiff contends that he worked closely with her and Edmund Pinto (who also worked in the Transportation Group and was terminated at the same time that Plaintiff was terminated). Plaintiff claims that Novak will testify that she "was extremely well-regarded for her knowledge and quality of work, that she was a very hard worker who helped to manage the practice, and that she had 'high profile' clients, who kept her busy on paid work." *Id.* at 3. Plaintiff claims that Novak will make similar observations about Pinto. In regard to the Plaintiff's and Pinto's terminations, Novak "is also expected to testify that 'the general consensus was that it was very odd, besides being badly structured, that they got rid of the oldest employees at PA,' and that [Novak] 'remember[s] thinking, my god, they just walked into a lawsuit.'" *Id.* Plaintiff also anticipates that Novak will testify that her termination was "the most shocking." *Id.*

Plaintiff asserts that Novak's lay opinion testimony is admissible under Federal Rule of Evidence 701 because it is "rationally based" on his perception and "helpful to a clear understanding" of his testimony "or the determination of a fact in issue." *Id.* (citing Fed. R. Evid. 704(a)). Plaintiff notes that "[c]ourts generally hold admissible under Rule 701 evidence in the form of lay opinion testimony in discrimination cases when given by a person whose position with the defendant entity provides the opportunity to personally observe and experience the defendant's policies and practices." Dkt. No. 94 at 1 (quoting *Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1179 (10th Cir. 2001).

PA moves to strike Novak's testimony as inadmissible lay opinion under Rule 701. Dkt. No. 96 at 3. PA charges that Novak's testimony regarding Plaintiff's job performance is irrelevant because her performance has never been an issue in this case, noting that Mr. Kelly testified "unequivocally that his decision" to terminate Plaintiff "had nothing to do with her performance." *Id.* Likewise, PA argues, Novak's testimony regarding Pinto's work performance is irrelevant because Pinto's work performance "had nothing to do with [Plaintiff's] inclusion in the reduction in force." *Id.* at 4. PA also charges that Novak's testimony regarding the reduction in force "is inadmissible hearsay, completely irrelevant, and not based on personal knowledge as required for admission of lay opinion under Rule 701." *Id.*

This Court agrees that Novak's proposed testimony is inadmissible. Novak's testimony regarding Plaintiff's job performance is irrelevant as Plaintiff's work performance is not an issue in this lawsuit. Introducing such irrelevant testimony may mislead and confuse the jury. What is more, in an employment discrimination action, as is the case here, Rule 701 bars lay opinion testimony that amounts to a naked speculation concerning the motivation for a defendant's adverse employment decision. *United States v. Rea*, 958 F.2d 1206, 1216 (2d Cir.1992). Witnesses are free to testify fully as to their own observations of the defendant's interactions with the plaintiff or with other employees, but "the witness's opinion as to the defendant's [ultimate motivations] will often not be helpful within the meaning of Rule 701 because the jury will be in as good a position as the witness to draw the inference as to whether or not the defendant" was motivated by an impermissible animus. *Id.*; *see also, Coles v. Perry*, 217 F.R.D. 1, 8 (D.D.C.2003) ("While [witness] might be able to testify as to what she saw and heard, her divination of why [employer] acted crosses the line from a legitimate opinion based on a perception to a specula-

tion as to [the employer's] motives. It is the difference between a witness testifying that a man was drunk and that a man was drunk because he was drowning his sorrows ever since his wife left him."); *Willco Kuwait (Trading) S.A.K. v. deSavary*, 843 F.2d 618, 624 (1st Cir.1988) (lay opinion testimony which does little more than tell the jury what result to reach, should not be admitted); *Hester v. BIC Corp.*, 225 F.3d 178, 185 (2d Cir.2000) ("[I]n an employment discrimination action, Rule 701(b) bars lay opinion testimony that amounts to a naked speculation concerning the motivation for a defendant's adverse employment decision."). Novak's proposed testimony that he "remembers thinking, my god, they just walked into a lawsuit" is exactly the type of conclusory lay opinion testimony that Rule 701 is meant to bar. Accordingly, Novak will be stricken from Plaintiff's witness list.

### 2. Ms. Mosner and Mr. Pinto

 Next, PA moves to exclude Anita Mosner and Edmond Pinto as witnesses at trial. As discussed above, Pinto was a Managing Consultant who worked in the Transportation Group with Plaintiff. He was also included in the 2003 reduction in force. He file suit against PA after he was terminated, charging that he was the victim of age discrimination. Ms. Mosner joined the Transportation Group in 2000, and in December 2000, she and two other PA employees filed suit in federal court alleging that their employment contracts with PA were not binding. Then, in September 2001, Mosner filed a complaint with the U.S. Equal Employment Opportunity Commission alleging discrimination based on her gender. Mosner ultimately withdrew her charge and paid "substantial monies" to PA in settlement. Dkt. No. 95 at 3. Plaintiff has identified both of these individuals to give "me too" testimony at

trial regarding alleged discriminatory activity at PA.

 "Evidence of an employer's past discriminatory or retaliatory behavior toward other employees—so-called 'me too' testimony—may, depending on the circumstances, be relevant to whether an employer discriminated or retaliated against plaintiff." *Nuskey v. Hochberg*, 723 F.Supp.2d 229, 233 (D.C.2010) (citing *Sprint v. Mendelsohn*, 552 U.S. 379, 385–388 (2008); *Parker v. HUD*, 891 F.2d 316, 321 (D.C.Cir.1989); *Elion v. Jackson*, 544 F.Supp.2d 1, 8 (D.D.C.2008)). "Such testimony is neither *per se* admissible nor *per se* inadmissible; the question whether such testimony is relevant and sufficiently more probative than unfairly prejudicial in a particular case is 'fact-based and depends on many facts, including how closely related the evidence is to the plaintiff's circumstances and theory of the case.'" *Id.* (quoting *Mendelsohn*, 552 U.S. at 387–88, 128 S.Ct. 1140).

 Among the factors relevant to the determination as to whether or not to allow the introduction of "me too" evidence in employment discrimination cases are whether the alleged discriminatory behavior by the employer is close in time to the events at issue in this case; whether the same decision-makers were involved; whether the witness and the plaintiff were treated in a similar manner; and whether the witness and the plaintiff were otherwise similarly situated. *Herbert v. Architect of the Capital*, Civil Action No. 09–1719, order dated July 23, 2013 (Judge Kollar–Kotelly) (citing *Nuskey*, 723 F.Supp.2d at 233).

Based on the foregoing factors, the Court concludes that Mosner's testimony is not relevant. Although Mosner was a member of the Transportation Group, she left PA well before Plaintiff was terminated. As such, she does not have any rele-

vant knowledge regarding the reduction in force. What is more, Mosner's charge against PA involved a different decision-maker (Miller) and events that occurred more than three years prior to the events in question here.[1] And, importantly, PA claims that Mosner "ultimately not only withdrew her [sex discrimination] charge, but paid substantial monies to PA in settlement," a claim that Plaintiff does not contest. Dkt. No. 95 at 3. Therefore, the Court concludes that Mosner's testimony is irrelevant and unduly prejudicial. Accordingly, Mosner will be prohibited from testifying at trial.

The Court will take Defendant's motion with respect to Pinto under advisement.

### C. Remaining Issues

Per the Court's instructions, Plaintiff and Defendant submitted a Joint Pretrial Statement on February 19, 2014. Dkt. No. 90. In it, the parties dispute what methodology should be used to determine back pay, in the event that such damages are awarded to Plaintiff. In addition, per the Court's request, the parties also submitted briefing on whether the back pay damages are an equitable remedy that is within the sole domain of the court. The Court will address each issue below.

### 1. How to Calculate Plaintiff's Back Pay Damages, If Any

■ Victims of employment discrimination are entitled to the most complete "makewhole" relief possible. *Peyton v. DiMario*, 287 F.3d 1121, 1126 (D.C.Cir. 2002). They are entitled to compensation for lost back pay and employment-related benefits, *see Thompson v. Sawyer*, 678 F.2d 257, 290 (D.C.Cir.1982), and prejudgment interest thereupon, *see Berger v.*

*Iron Workers Reinforced Rodmen, Local 201*, 170 F.3d 1111, 1139 (D.C.Cir.1999).

■ As the parties' dispute makes clear, there are two ways to calculate lost back pay and benefits: (1) the periodic mitigation method, and (2) the aggregate mitigation method. Under the periodic mitigation method, if a plaintiff's interim earnings in any year exceed the wages she lost due to the discrimination, that excess must not be deducted from any back pay for other years to which plaintiff is entitled to relief. *See, e.g., Jean–Baptiste v. D.C.* 958 F.Supp.2d 37, 49 (D.D.C.2013); *Schroer v. Billington*, 2009 WL 1543686, *1 (D.D.C. April 28, 2009) (plaintiff is entitled to an award for periods when her anticipated earnings would have exceeded her interim earnings, without any offset for periods when her interim earnings exceeded her anticipated earnings); *Leftwich v. Harris–Stowe State Coll.*, 702 F.2d 686, 693 (8th Cir.1983) (noting that the Eighth, Fifth, and Tenth Circuits employ the same approach). On the other hand, the aggregate mitigation method compares the wages plaintiff lost with her interim earnings over the entire recovery period. *EEOC v. New York Times Broad. Serv., Inc.*, 542 F.2d 356, 359 (6th Cir.1976). If her lost earnings would have been less than her interim earnings, she does not receive a back pay award. *Id.*

■ Here, the choice of method makes a difference. Since her termination, Plaintiff has established a successful consulting business, which PA charges resulted in Plaintiff doing better financially than she would have done had she stayed at PA. PA argues that Plaintiff is advocating for the use of the periodic method because there were a "few years" after Plaintiff's termination that she earned less than what

---

**1.** While Plaintiff contests that Kelly was the sole decision-maker in the decision to terminate her, she has never alleged that Miller was involved in the decision.

she likely would have earned had she stayed with PA. Def.'s Mot. at 20. However, if the aggregate approach is used, Plaintiff "actually had a gain, not a loss, over the period since her employment ended." *Id.*

Not surprisingly, PA urges this Court.to employ the aggregate approach to Plaintiff's back pay damages, if any, suggesting that "this Court, as well as courts in multiple other jurisdictions, has opted to use the aggregate method, not the periodic method, particularly in unlawful termination claims brought under the [ADEA]." *Id.* at 18. However, this Court's research demonstrates that the courts in this district routinely apply the period approach. *See, e.g., Jean–Baptiste,* 958 F.Supp.2d at 49 (employing the period method to DCHRA claims); *Schroer,* 2009 WL 1543686, at *2 (noting that "the law is well-settled in favor of the periodic mitigation method"); *Hartman v. Duffey,* 8 F.Supp.2d 1, 6 (D.D.C.1998) ("periodic mitigation is the preferred method for determining back pay liability in discrimination cases."); *see also, NLRB v. Seven–Up Bottling Co. of Miami, Inc.,* 344 U.S. 344, 347, 73 S.Ct. 287, 97 L.Ed. 377 (1953) (reasoning that the aggregation mitigation method would give employers the incentive to delay reinstatement for as long as possible, "since every day the employee put in on the better paying job [would] reduce[ ] back pay liability"); *Leftwich,* 702 F.2d at 693 (ADEA case).

PA cites two cases from this district in which the court appears to have employed the aggregate mitigation method. However, in neither case was there an issue that the plaintiff's interim earnings may have exceeded the earnings she would have received but for the discrimination. As such,

the issue of which method to use in the calculation of back pay was not raised by the parties nor discussed by the court. *See, Chadwick v. D.C.,* 56 F.Supp.2d 69 (D.D.C.1999) (subtracting the $3,000 interim pay plaintiff had earned from the $66,980.61 she would have earned but for the discrimination); *Bishop v. Jelleff,* 398 F.Supp. 594, 594–97 (D.D.C.1974) (noting, without citation, that back pay is measured by the difference between the salary an employee would have received but for the discrimination and the salary the employee actually received from other employment).[2] PA also argues that Judge Lamberth recently cautioned against the use of the periodic mediation approach. Def.'s Mot. at 19–20 (citing *Jean–Baptiste,* 2013 958 F.Supp.2d at 49 n. 8). This takes Judge Lamberth's statement out of context. In *Jean–Baptiste,* Judge Lamberth noted that if a plaintiff failed to "mitigate her damages," equitable concerns may counsel against the use of the periodic approach. *Id.* Such is not the case here. Indeed, in this case, PA urges this Court to employ the aggregate approach because Plaintiff so successfully mitigated her damages. Accordingly, in the event Plaintiff is entitled to back pay damages, the damages will be calculated using the periodic mitigation approach.

## 2. Whether an Award of Back Pay Is within the Sole Discretion of the Court

PA asserts that "the D.C. Circuit has unequivocally held that back pay is an equitable remedy," and such, an award of back pay is "within the sole discretion of the Court." Dkt. No. 97 at 1. PA's argument is misleading, at best. This Court's own research did not reveal a single case involving DCHRA and/or private sector

---

2. One of the six plaintiffs in the *Bishop* case may have been re-employed in a position "at an equal or greater salary," but that particu-

lar plaintiff did not claim back pay damages. *Bishop v. Jelleff,* 398 F.Supp. 579, 595 (D.D.C. 1974).

ADEA claims, in which the D.C. Circuit implied, much less unequivocally stated, that a jury is prohibited from determining back pay damages. Certainly the cases cited by PA do not stand for such a proposition. PA cites to six cases—five of the six cases did not involve claims under the DCHRA and/or the ADEA.[3] In the only case cited by PA that did involve a DCHRA claim, *Jean–Baptiste v. District of Columbia*, 958 F.Supp.2d 37 (D.D.C. 2013), the parties jointly requested that the district court determine back pay damages. Dkt. No. 99, Ex. 1 at 8. Thus, the issue of whether the judge or jury should ordinarily award back pay under the DCHRA was not addressed by the court.

On the other hand, Plaintiff cites to a number of DCHRA and/or private sector ADEA cases in which the jury awarded back pay damages. *See, e.g., Martini v. Federal Nat. Mortg. Ass'n*, 178 F.3d 1336 (D.C.Cir.1999); *Kakeh v. United Planning Organization, Inc.*, 655 F.Supp.2d 107 (D.D.C.2009); *Dickerson v. HBO & Co.*, 1995 WL 767193 (D.D.C.1995); *Banks v. Travelers Companies*, 180 F.3d 358, 363–64 (2d Cir.1999). Accordingly, this Court is not persuaded that awarding back pay damages under the DCHRA and/or ADEA is exclusively within the courts' domain.

## IV. CONCLUSION

For the foregoing reasons, the Court HEREBY:

1. DENIES Defendant's Motion *in Limine* (Dkt. No. 79);

2. GRANTS Defendant's Motion *in Limine* to exclude Anita Mosner as a witness and takes under advisement the motion as to Edmund Pinto (Dkt. No. 95);

3. EXCLUDES Mr. Novak's lay opinion testimony (Dkt. No. 96); and

4. HOLDS that Plaintiff's back pay damages, if any, will be calculated under the periodic method and that either a judge or jury may award such damages for DCHRA and/or private sector ADEA claims.

---

3. Indeed, all six cases cited by PA, *Peyton v. DiMario*, 287 F.3d 1121 (D.C.Cir.2002), *Barbour v. Merrill*, 48 F.3d 1270 (D.C.Cir.1995), *Kapche v. Holder*, 677 F.3d 454 (D.C.Cir. 2012), *Porter v. Natsios*, 414 F.3d 13 (D.C.Cir. 2005), and *Brown v. District of Columbia*, 768 F.Supp.2d 94 (D.D.C.2011), and *Jean–Baptiste v. District of Columbia*, 958 F.Supp.2d 37 (D.D.C.2013) involved Title VII claims, which

Plaintiff argues specifically assigns the role of awarding back pay damages to the trial court because Title VII's remedial scheme is the "result of the fact that, as originally enacted (and until the amendments to the law in 1991), Title VII did *not* allow for trial by jury, and *all* remedies were awarded by the district court as equitable relief." Dkt. No. 99 at 2 (emphasis in original).