# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued March 20, 2015        Decided September 18, 2015

No. 14-7051

GREG BURLEY,
APPELLANT

v.

NATIONAL PASSENGER RAIL CORP., DOING BUSINESS AS
AMTRAK,
APPELLEE

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cv-01222)

---

*John F. Karl*, *Jr.* argued the cause and filed the briefs for appellant. *Kristen Grim Hughes* entered an appearance.

*Andrew G. Sakallaris* argued the cause for appellee. With him on the brief was *Jonathan C. Fritts*.

Before: TATEL, KAVANAUGH and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*: Gregory Burley, an African-American train engineer, claims that his employer, the National Passenger Railroad Corporation (Amtrak), discriminated against him because of his race in violation of Title VII and the District of Columbia Human Rights Act. After the engine Burley was driving passed a stop signal at the rail yard and was forced off the rails by a safety derailer, Amtrak fired him and suspended his engineer certificate. The district court granted Amtrak's motion for summary judgment. Burley contends that was error because Amtrak's entire investigation of the derailment was so patently flawed, and the discipline it imposed on him so disproportionate, that a jury could infer that Amtrak engaged in intentional racial discrimination. Amtrak defends the discipline on the ground that passing a signal in a work area is a serious infraction likely to cause serious injury or death to workers on or around the tracks, even if no one was injured in this case and the property damage was only modest. Amtrak also relies on the undisputed evidence that the official who decided on the severity of the discipline was unaware of Burley's race. We have carefully examined the record and Burley's arguments. Because no jury could reasonably conclude based on the evidence in the record that Amtrak was motivated by Burley's race to take the adverse actions of which he complains, we affirm.

## I. Background

At the time of the accident, Burley worked as an engineer at Amtrak's Ivy City Maintenance Facility, a rail yard in Washington, D.C., where he moved rail cars around the facility as needed for maintenance and repair. Burley's work was governed by the Northeast Operating Rules Advisory Committee Operating Rules (NORAC Rules). NORAC Rule 16 states that the engineer must not allow the train to pass a

blue signal—a type of rail-yard stop sign indicating that workers may be on or near the track ahead and that continuing forward may cause serious injury or death. A blue signal typically consists of a blue metal flag and a flashing blue light to make it visible in the dark, but an engineer must stop for a blue signal even if there is no blue light. Blue signals may be accompanied by derailers, which are additional safety devices to protect track workers. Sometimes a blue light that accompanies a blue signal flag is affixed to a nearby wall, and sometimes a blue light is attached to the signal itself. When, for whatever reason, an engine fails to stop for a blue signal, a derailer, if present and in an "applied" position, forces the engine off the track before it hits anyone. NORAC Rule 104(d) requires engineers to know the locations of permanent derailers and prohibits an engineer from operating over an applied derailer.

In the early morning darkness of October 20, 2007, the engine Burley was driving at the Ivy City yard derailed. Burley was working with Conductor Jerry Ebersole, a white male, and Assistant Conductor Lawrence Mahalak. Near the end of their shift, the crew was instructed to move a train car that had undergone maintenance work on Track 7 in the Service and Inspection Building. As the engine approached Track 7 to retrieve the repaired car, Ebersole instructed Mahalak to dismount the engine and walk ahead in order to prepare the car to be towed out. Ebersole threw switches on the track, boarded the train, and instructed Burley to go forward.

As the train moved along Track 7, Ebersole dismounted the slowly moving train, intending to walk ahead of the train to the Service and Inspection Building. Ebersole stepped down from the front edge of the engine where Burley could not see him, and did not tell Burley that he had left the train or

that the engine was approaching an applied derailer on the track. It is undisputed that Burley's view of the derailer just ahead was blocked, given his position on the engine and the curve of the track. According to Burley, he did not see any blue signal on the track as he approached, and he noticed that the blue lights on the outside of the service building were not illuminated (as they should have been if a blue signal were displayed on the track). Shortly after Ebersole exited the train, Burley ran over the derailer and the train derailed. Nobody was hurt, and the property damage was not extensive.

Because of the potential for harm to track workers, however, it is undisputed that Amtrak considers any blue-signal infraction to be extremely serious. Leslie David Smith, Burley's supervisor in the Transportation Department and the senior Amtrak supervisor on duty at the time of the derailment, who is white, convened an incident committee to investigate. The other two members of the committee, an assistant superintendent in the Mechanical Department and a track supervisor in the Engineering Department, are African American. Smith inspected the scene, took photographs, interviewed the crew, and discussed the incident with other members of the Transportation Department. J.A. 153-55, 405-06. Smith recounted that he observed a blue flag and a blue light, still flashing, underneath the derailed engine. He concluded in the committee report that the blue signal was displayed on the track at the time of the derailment, and that Burley had passed through the blue signal and over the derailer. Smith reported that Ebersole had exited the engine before the derailment. Smith apparently remained unaware, however, that Ebersole failed to tell Burley when Ebersole left the engine. Smith concluded that Burley violated safety rules.

Amtrak brought formal disciplinary charges against Burley and Ebersole. Each of them requested a "waiver"—a

dispensation available under Amtrak's disciplinary rules to an employee who accepts responsibility for a rule violation and forgoes the right to a formal investigation in exchange for a lesser penalty. Amtrak granted Ebersole's request for a waiver, but denied Burley's. A hearing officer then held a formal disciplinary hearing on the charges against Burley. At the hearing, Burley's union represented him, and he had an opportunity to testify and cross-examine Amtrak's witnesses. The hearing officer, relying in large part on Smith's testimony, concluded that the evidence demonstrated that the blue signal was correctly displayed and that the charges against Burley had been proven.

Amtrak transmitted the incident committee's report and the formal hearing record to Daryl Pesce, Amtrak's General Superintendent of the Mid-Atlantic Division, who was responsible for imposing discipline. Pesce was unaware of Burley's race. He reviewed the hearing officer's decision, the hearing transcript, and Smith's report and concluded that Burley's "carelessness in disregarding a Blue Signal created the risk of serious injury or death and thus warranted termination" and a thirty-day suspension of his engineer certificate. Pesce Decl. (J.A. 249).

Burley appealed internally to Amtrak's Director of Labor Relations, who denied the appeal, and then externally to Special Board of Adjustment 948, which concluded that Burley committed the violation, but reinstated him (with seniority but without back pay). Burley appealed the suspension of his engineer's certificate to the Federal Railroad Administration's Locomotive Engineer Review Board. The Locomotive Engineer Review Board found a lack of substantial evidence that a blue signal was properly displayed before the derailment, and therefore overturned the certification suspension.

After exhausting other remedies, Burley sued Amtrak for racial discrimination, seeking, among other relief, two years' worth of back pay. The district court granted summary judgment to Amtrak, *Burley v. Nat'l Passenger Rail Corp.*, 33 F. Supp. 3d 61 (D.D.C. 2014), and Burley timely appealed.

## II. Legal Standards

Our review of a district court's grant of summary judgment is *de novo*. *Calhoun v. Johnson*, 632 F.3d 1259, 1261 (D.C. Cir. 2011). Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party is entitled to summary judgment if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute about a material fact is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in its favor. *Calhoun*, 632 F.3d at 1261. This court, like the district court, may not make credibility determinations or weigh the evidence. *Id.*

Amtrak's position is that it disciplined Burley based on an investigation showing what it considers to be an extremely serious infraction of safety rules, and that Burley's race had nothing to do with it. In a Title VII action, once an employer has offered a legitimate, non-discriminatory reason for the challenged employment decision, the court's inquiry focuses on "one central question: Has the employee produced

sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). To answer that question at the summary judgment stage, the court assesses whether "there is evidence from which a reasonable jury could find that the employer's stated reason for the firing is pretext" and that "unlawful discrimination was at work." *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013). The analysis is the same for Burley's claim under the District of Columbia Human Rights Act (DCHRA). *See id.* Burley's Title VII claims and DCHRA claims thus rise and fall together.

Burley seeks to show that Amtrak's proffered reason for its discipline of Burley was pretextual. He contends that Smith's investigation arrived at conclusions so erroneous and contrary to the evidence—especially concerning the location and condition of any blue signal—as to suggest discrimination. The investigation's failure to examine what Burley characterizes as key, exculpatory videotape evidence was, in Burley's view, itself a ground on which a jury could find that Amtrak discriminated. Burley asserts that the investigation as a whole was little more than a shoddy cover-up for the real, discriminatory reason for his discipline.

A plaintiff can establish that an employer's stated reason for the adverse employment action was a pretext for discrimination by showing that "the employer is making up or lying about the underlying facts that formed the predicate for the employment decision." *Brady*, 520 F.3d at 495. "If the jury can infer that the employer's explanation is not only a mistaken one in terms of the facts, but a lie, that should

provide even stronger evidence of discrimination." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1293 (D.C. Cir. 1998) (en banc). A plaintiff might also establish pretext with evidence that a factual determination underlying an adverse employment action is egregiously wrong, because "if the employer made an error too obvious to be unintentional, perhaps it had an unlawful motive for doing so." *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996). An employer's investigation that is so unsystematic and incomplete that a factfinder could conclude that the employer sought, not to discover the truth, but to cover up its own discrimination can also permit a factfinder to find pretext. *See Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 855 (D.C. Cir. 2006). Our purpose in smoking out pretextual employer rationales is to discern whether prohibited discrimination may be a real reason for the challenged action. A false "mistake" or obvious omission can itself bespeak discrimination.

Burley also points to the relatively lenient treatment of other, white employees whom he views as similarly situated to him as confirmation that his discipline was unjustifiably harsh based on his race. Evidence suggesting that the employer treated similarly situated persons who were not the same race as the plaintiff more favorably than it treated the plaintiff can also be probative of discrimination. *See Brady*, 520 F.3d at 495.

## III. Analysis

Burley contends that the summary judgment record could support a conclusion that Amtrak's stated reason for disciplining him was pretextual, that Smith's investigation was racially motivated, and that Smith's tainted investigation affected Amtrak's subsequent decisions to discipline him.

Specifically, Burley contends that Smith conducted an incomplete and unfair investigation and presented misleading and false conclusions that disproportionately laid the blame on Burley as compared to Ebersole, the white conductor on duty. Burley asserts that the less harsh discipline Amtrak imposed on white employees for what he characterizes as comparable disciplinary infractions confirms that its treatment of him was racially biased.

To succeed on his claim, Burley must establish that his race was a motivating factor in Amtrak's adverse action against him. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148-49 (2000). As is frequently true, even of successful discrimination cases, there is no direct evidence here—neither documentary nor testimonial—of racial bias. Indeed, there is no evidence that Amtrak's final decision maker on Burley's discipline, General Superintendent Pesce, was even aware of Burley's race. Burley does not dispute that Pesce was unaware that Burley is African American; rather, he contends that Smith's discriminatory animus infected the disciplinary process such that discrimination was a significant cause of the discipline Pesce imposed. Pesce was, in Burley's view, an unwitting but effective agent of Smith's discrimination.

Burley thus invokes a combination of a cat's paw theory and circumstantial evidence of racial discrimination. The Supreme Court set forth the standard for prevailing on a cat's paw theory in *Staub v. Proctor Hospital*, 131 S. Ct. 1186 (2011).[1] The plaintiff in *Staub* did not contend that the

---

[1] Although *Staub* was not a Title VII case—it involved discrimination based on the employee's military obligations in violation of the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. § 4311—we have

manager who made the ultimate decision to fire him harbored the prohibited motive, but that his direct supervisors did, and that those supervisors' bias influenced the ultimate decision maker. *Id.* at 1190. *Staub* held that a plaintiff could prevail on such a theory "if [1] a supervisor performs an act motivated by [discriminatory] animus, [2] that is intended by the supervisor to cause an adverse employment action, and …[3] that act is a proximate cause of the ultimate employment action." *Id.* at 1194. Because Burley's case founders on the absence of evidence raising a reasonable inference that Smith was motivated even in part by racial discrimination, we need not separately analyze the causal factors.

## A.

Smith's conclusions should not be credited, Burley asserts, because Smith drew falsely inculpatory inferences against Burley from the physical evidence and witness accounts at the scene. The principal evidence on which Smith's investigative committee relied to conclude that Burley violated the safety rules was that, shortly after the accident, Smith found (and photographed) a visibly bent blue signal alongside a detached blinking blue light underneath the derailed engine. J.A. 155-56, 358-59. Based on what he saw and what eyewitnesses reported, Smith inferred that a blue signal had been correctly displayed. J.A. 366-67.

Burley seeks to impugn Smith's conclusion by noting that Smith did not see the derailment, whereas Burley was present and observed no blue signal. Burley also contends that if a blue flag and light had been in place and an engine struck them, they would have been destroyed, not merely bent

acknowledged its relevance in the Title VII context. *See Hampton v. Vilsack*, 685 F.3d 1096, 1102 (D.C. Cir. 2012).

as Smith reported. In Burley's view, the Locomotive Engineer Review Board's conclusion that substantial evidence did not show that the blue signal was properly displayed is yet another sign that Smith's contrary conclusion was racially motivated.

Burley's analysis of the record falls short of identifying grounds on which a factfinder reasonably could conclude that Amtrak's stated rationale for disciplining him was a pretext for racial discrimination. We fully credit that a jury might fairly believe Burley's testimony that he did not see any blue signal in place. We accept that a plaintiff's own firsthand observations of relevant facts are probative evidence, and that we must not set them aside merely because they come from a party who necessarily has a stake in the outcome. The Locomotive Engineer Review Board's assessment of the weight of the evidence bolsters Burley's contention that there was no blue signal in place and suggests that a jury might similarly conclude that Smith erred in determining that Burley had crossed a displayed blue signal. In the circumstances of this case, however, the plausibility of those differing observations and inferences is not, without more, grounds on which a reasonable jury could conclude that Smith was so far off base as to suggest that he acted with a racial motive.

**B.**

Burley next argues that bias can be inferred because Smith intentionally failed to disclose a mitigating fact about the derailment in his investigative report and hearing testimony. According to Burley's uncontradicted testimony, train conductor Ebersole stepped off the engine without warning him, leaving Burley unaware that Ebersole was not in a position to signal to Burley that there was a displayed blue signal and an applied derailer on the track ahead. J.A. 517-

18. According to Burley, if Ebersole had told him that he was exiting the train, the accident would not have happened. Smith never mentioned in either his investigative report or his testimony at Burley's disciplinary hearing, however, the fact that Burley did not know that Ebersole was out of position at the time of the accident. Burley argues that is because Smith consciously omitted it for racially discriminatory reasons.

Burley's argument fails because there is no evidence that Smith knew Burley was unaware of Ebersole's position. Ebersole did not tell Smith when Smith interviewed him shortly after the incident that he left the train without telling Burley. J.A. 633-41. Burley did not testify at his deposition that he or anyone else to his knowledge ever told Smith that Burley was unaware that Ebersole was out of position. Burley's union representative did not cross-examine Smith at Burley's disciplinary hearing about Smith's failure to include that fact in his report. Smith testified at his deposition that he did not know that Ebersole had exited the train without informing Burley. J.A. 161. Burley's counsel, by post-argument letter, notes that "[t]here is no direct evidence in the record that Smith knew," *see* Burley 28(j) Letter (Mar. 26, 2015), and despite the opportunity for Burley and his representative to develop the point, the record is devoid of even a circumstantial basis from which to infer that Smith knew when he investigated and testified at Burley's hearing that Burley thought Ebersole was still on the train with him at the time of the accident and so would have warned him of any signal or applied derailer ahead. Smith's withholding of mitigating evidence of which he was unaware could not support a determination that Smith acted with racial bias.

## C.

Burley next contends that a reasonable jury could conclude that Smith's investigation was so incomplete, unsystematic, or biased as to suggest that Smith discriminated against Burley on the basis of his race. An investigation that "lack[s] the careful, systematic assessments of credibility" of the witnesses and evidence "one would expect in an inquiry on which an employee's reputation and livelihood depended" may give rise to an inference that the employer's reasons are a pretext for discrimination. *Mastro*, 447 F.3d at 855. A reasonable jury can conclude that an employer's reasons were pretextual and that discrimination was afoot if a plaintiff can show that an employer's "investigation, which was central to and culminated in [the plaintiff's] termination, was not just flawed but inexplicably unfair." *Id.*

Smith took a number of steps one would expect of an investigator who sincerely sought to determine what actually happened. Within hours of the event, Smith interviewed all of the relevant witnesses and took their written statements. He formed an incident committee, inspected the accident site, and took photos. Smith questioned Burley and the other people who were working at or near the site of the derailment about precisely what had happened, and wrote a report that resulted in significant formal charges against both Burley and Ebersole.

Burley has identified one investigatory step he contends Smith should have taken but did not: Smith should have reviewed videotape of the derailment. It is unclear, however, whether any such videotape existed. The union representative who appeared on Burley's behalf at his disciplinary hearing contended that he was "told" in advance of the hearing "that security camera video of the incident existed" and that the

employee responsible for monitoring the recording equipment later told him "that AMTRAK had erased the tapes." J.A. 332 ¶ 4. Another employee testified in a deposition that "there should have been video of everything that went on," "that if there was a derailment, [a group of Amtrak personnel] looked at those videos," and that "nine times out of ten" Smith would have reviewed videotape if there was a derailment. J.A. 420, 422, 423. But that witness acknowledged that he never saw any video of the derailment at issue here, did not see Smith view the video, did not know how many cameras there were or where they were placed, and did not know how long any tapes would be preserved. He asserted "I'm not the video man," and identified by name and home town the long-term Amtrak employee who "was in control of the whole video system from beginning to the end of it." J.A. 420. Burley did not seek to depose that employee or anyone at Amtrak who could speak authoritatively about video recordings, if any, of the yard when the derailment occurred.

Even assuming that a relevant video recording existed, Smith's failure to review it does not support an inference that Smith's actions were motivated by race. Burley has not identified any fact that he believes the recording would have revealed that might have affected the disciplinary proceedings. The key factual omission Burley cites in Smith's investigation was Smith's failure to take into account that Burley was unaware that Ebersole had departed the engine. Smith acknowledged that Ebersole was not on the engine. Even a clear and well lit video taken at close range would not have revealed what Burley knew about Ebersole's whereabouts. Smith's investigation was not unreliable or otherwise "inexplicably unfair" without the video recording. *See Mastro*, 447 F.3d at 855. In the absence of any reason to think that a videotape could have revealed any material information, no reasonable jury could conclude that failing to

obtain and review it was an error so obvious it must have been intentional. *See Fischbach*, 86 F.3d at 1183.[2]

## D.

Finally, Burley claims that Amtrak disciplined him significantly more harshly than other, similarly situated white employees whom he asserts committed infractions of comparable or greater gravity, and that such differential treatment could lead a reasonable jury to find that Amtrak acted with a racially discriminatory motive. Burley first points to Ebersole, the white conductor who was involved in the same derailment, whom Burley claims bore more responsibility for it than he did. Amtrak denied Burley's request for a waiver and terminated him. By contrast, Amtrak granted Ebersole a waiver and suspended him for only fifteen days. Burley also identifies six white engineers who received more lenient discipline than he did for infractions he views as more serious. Amtrak's more lenient treatment of Ebersole, and of white engineers in other incidents comparable to his own, Burley contends, evinces Amtrak's racially

---

[2] The non-probativeness of potential video evidence to the issue Burley seeks to dispute defeats Burley's request for a spoliation inference. Burley argues that Amtrak's failure to produce any videotape of the derailment warrants a negative inference that Amtrak destroyed videotapes because they were favorable to Burley. We have recognized that "a negative inference may be justified where the defendant has destroyed potentially relevant evidence." *Gerlich v. U.S. Dep't of Justice*, 711 F.3d 161, 170 (D.C. Cir. 2013). But, in addition to failing to make the case that there were any tapes of the derailment that were destroyed, Burley identifies no factual ground for concluding that Smith's failure to review tapes was such an obvious error as to support a discrimination finding, so no spoliation inference is warranted.

discriminatory motive and should have precluded summary judgment in Amtrak's favor.

The primary flaw in Burley's attempt to show pretext through comparator evidence is that it is undisputed that the Amtrak supervisors who denied the waiver and disciplined Burley did not know his race. The only individuals involved in Burley's disciplinary process with the power to grant or deny a waiver were General Superintendent Pesce and Superintendent Michael Sherlock, Pesce's immediate subordinate. Either Pesce or Sherlock denied Burley's waiver request, though the record does not make clear who. (The record on the waiver issue is sparse because the collective bargaining agreement prohibited Amtrak from keeping formal records about waiver decisions, and nobody at Amtrak recalls deciding Burley's or Ebersole's waiver request.) Pesce decided Burley's punishment after his disciplinary hearing. Burley's race could not have influenced either the decision to deny Burley a waiver or the decision to discharge him and suspend his engineer's certificate, for it is undisputed that neither Pesce nor Sherlock knew Burley's race. *See* J.A. 195, 282-83 ¶ 59, 300 ¶ 59.

Burley counters with his cat's paw theory: Even without knowing Burley's race, Pesce and Sherlock discriminated against him because they relied on Smith's investigation and hearing testimony and thereby unwittingly gave effect to Smith's bias in meting out the discipline. *See Griffin v. Washington Convention Ctr.*, 142 F.3d 1308, 1312 (D.C. Cir. 1998). As we explain above, however, that theory fails because Burley has not introduced evidence that could persuade a reasonable jury that Smith discriminated against Burley.

Burley does not dispute that Amtrak took blue signal violations particularly seriously in order to protect the safety of employees working on and around the tracks. Pesce and Sherlock each testified that he would have denied an engineer's waiver request in the case of a blue signal violation, especially where the engineer did not accept responsibility, because of the severity of such an infraction. J.A. 183-84, 195. Pesce testified that, for the same reason, termination and suspension of the engineer's certificate was the appropriate discipline under those circumstances.

Burley invokes comparator evidence in an effort to undercut those explanations. A plaintiff can establish pretext masking a discriminatory motive by presenting "evidence suggesting that the employer treated other employees of a different race . . . more favorably in the same factual circumstances." *Brady*, 520 F.3d at 495. Amtrak's more lenient disciplinary treatment of white employees who violated Amtrak rules does not support the inference that Pesce and Sherlock discriminated against Burley on account of his race, however, because the white employees he identifies are not similarly situated to him. To prove that he is similarly situated to another employee, a plaintiff "must demonstrate that [he] and the allegedly similarly situated . . . employee were charged with offenses of comparable seriousness." *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999) (internal quotation marks and citation omitted); *see Coleman v. Donahoe*, 667 F.3d 835, 846-47 (7th Cir. 2012). "A plaintiff must also demonstrate that 'all of the relevant aspects of [his] employment situation were nearly identical to those of the [other]' employee." *Holbrook*, 196 F.3d at 261 (quoting *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995)). Factors that bear on whether someone is an appropriate comparator include the similarity of the plaintiff's and the putative comparator's jobs

and job duties, whether they were disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses. *See Coleman*, 667 F.3d at 847.

Ebersole is not an apt comparator because Burley has failed to demonstrate that he and Ebersole were similarly situated. Burley and Ebersole had different roles and, consequently, bore different responsibility for causing the derailment. As a conductor, Ebersole was responsible for overseeing the train and the crew; Burley, the engineer, was responsible for operating the engine. The rules required that Ebersole stay in a position where he could signal Burley; they required that Burley stop the train if the conductor was not in a position to signal to him. J.A. 336. Ebersole's responsibility, if any, for the derailment derived from his failure to be in position. Burley's responsibility, in contrast, stemmed from his driving the train over an applied derailer. Given the undisputed evidence of their distinct roles and the different nature of their violations, Burley has not genuinely disputed the reasonableness of Amtrak's decision to treat Burley as more culpable for the accident than Ebersole.

The other comparator evidence also fails to defeat Amtrak's summary judgment motion because Burley is unable to demonstrate either that other white employees were found to have committed offenses of comparable seriousness, or that they were differently disciplined by the same supervisors who disciplined Burley. Not one of the white engineers he identified crossed a blue signal. Most did not commit offenses of even arguably comparable seriousness. Only one derailed a train, and he was not disciplined by Pesce or Sherlock. Burley's proffered comparator evidence thus cannot permit a reasonable factfinder to conclude that Amtrak's nondiscriminatory reason for disciplining Burley for passing a blue signal more harshly than it disciplined other,

white employees who committed different infractions was a pretext for discrimination.

Burley contends that the mere fact that two employees had different titles and duties does not necessarily undermine the probative value of their different treatment. Burley is, as a general matter, correct. He relies on cases, including *Coleman*, 667 F.3d at 849, in which employees with different responsibilities and titles nonetheless engaged in similar conduct and were governed by the same rules and standards. But Burley's situation is different. Burley's conduct as Amtrak reasonably understood it at the time, together with the high stakes of a blue signal violation, carried enhanced culpability. For all of these reasons, Amtrak's more serious discipline of Burley as compared to the other, white employees he identifies as putative comparators could not support a jury conclusion that Amtrak discriminated against Burley based on his race.

Drawing every justifiable inference in Burley's favor, as we must, we find no basis in the record upon which a reasonable factfinder could conclude that whatever investigative flaws or unfairness Burley may have suffered relating to this incident were so unexplained or otherwise striking as to suggest that Amtrak was motivated by Burley's race to discipline him.

\* \* \*

For the foregoing reasons we affirm the decision of the district court.

*So ordered.*