*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 23-CV-0440

HO-HSUAN HSIEH, APPELLANT,

v.

FORMOSAN ASSOCIATION FOR PUBLIC AFFAIRS, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2022-CA-001929-B)

(Hon. Danya A. Dayson, Trial Judge)

(Submitted April 17, 2024                    Decided June 6, 2024)

*Nicholas Woodfield* was on the brief for appellant.

*Timothy P. Bosson* and *Robert Rose* were on the brief for appellee.

Before EASTERLY and DEAHL, *Associate Judges*, and THOMPSON, *Senior Judge.*

THOMPSON, *Senior Judge*: Appellant, Ho-Hshuan Hsieh, sued his former employer, appellee Formosan Association for Public Affairs ("FAPA"), alleging disability discrimination in violation of the District of Columbia Human Rights Act (the "DCHRA"). The Superior Court granted summary judgment in favor of FAPA, determining that appellant failed to provide sufficient evidence to support a finding that he suffered from a qualifying disability under the DCHRA and failed

to demonstrate that FAPA had "any awareness or perception of [appellant's] disability." In this appeal from the summary judgment ruling, appellant contends that the trial court erred in determining that he failed to establish a prima facie case of disability discrimination. We assume without deciding that appellant did establish a prima facie case of "as regarded" disability discrimination. We go on to conclude, however, that on the present record, a reasonable juror could not have found FAPA's proffered legitimate reasons for terminating appellant to be pretextual, and thus that appellant did not raise a triable issue of fact as to his unlawful termination claim. We therefore affirm the judgment of the Superior Court.

## I. Background

Appellant began working for FAPA as a policy analyst on March 30, 2021. Appellant testified during his deposition that he believed he was hired to work as a lobbyist on behalf of FAPA in the U.S. Senate, on issues related to Taiwan. FAPA personnel testified that appellant was hired for what they believed were his excellent writing skills, to write articles, including for FAPA's weekly publication *Taiwan This Week*. The parties agree, however, that at some point in appellant's tenure at FAPA, appellant's various co-workers began to express dissatisfaction with his written work. Their comments included statements that appellant "was

not a very good writer," that his articles were not well-structured and lacked coherence and cohesiveness, and that his "writing style was completely below expectations and subpar." After appellant told Coen Blaauw, FAPA's executive director and appellant's mentor, that the credit for appellant's publication success prior to his employment with FAPA went to his editors, Blaauw felt shocked and "kind of betrayed." In an interrogatory response verified by its President, Dr. Minze Chien, FAPA stated that "articles or writing samples [appellant] provided in the [job] interview process, in hindsight, appeared to have been heavily edited by others, as [appellant] was never able to produce a good work product for FAPA." According to the interrogatory responses, there were also complaints that appellant "exhibited attitudinal problems," "would not follow the tasks assigned," was not receptive to feedback, "lacked the necessary knowledge and research skills for the position," "had a poor work ethic," was unreliable, was difficult to work with, and did not respect his female co-workers. For his part, appellant acknowledged that his work product sometimes contained spelling and grammatical errors, told a friend that FAPA was "not exactly happy with his work product," felt that he had not "handled relations [at FAPA] that well," and understood that he had rubbed some of the FAPA staff the wrong way.

Appellant was diagnosed with adjustment disorder in May 2021 and with PTSD in September 2021. He testified that the catalyst for these conditions was a

violent sexual assault he suffered in January 2021.  Appellant further testified that his symptoms related to his diagnosed conditions included anxiety, intrusive thoughts, mood swings, nail biting, skin picking, difficulty organizing thoughts, feelings of low energy, sadness, and intense worrying.

During appellant's tenure at FAPA, the organization had only five employees, including Dr. Chien (who was actually a volunteer), Mr. Blauuw, Dr. Chih-Jung Huang, Cosette Chen, and Chih-Yun Huang ("Ms. Huang").  According to Dr. Huang, a FAPA policy fellow, appellant never made him aware of his mental health diagnoses.  Ms. Chen, then FAPA's assistant administrative manager, stated in her declaration that she did not become aware of appellant's diagnoses until after he was terminated from his position at FAPA and that appellant "never requested any time off or accommodations relative to his condition(s)."  To appellant's knowledge, none of the FAPA staff knew he had been diagnosed with an adjustment disorder, but he testified that in May 2021, he revealed to the entire staff that he that he had begun "working with a therapist" and tried to reach out to FAPA staff members one-on-one to tell them what he had been going through.  Appellant's co-workers testified to having varied understandings of the reason for the therapy.  Ms. Huang did not recall appellant saying that he "had to get therapy"; according to her, appellant said that he had to "focus on his family issues," and she recalled him saying that it was family members who were in

therapy. Dr. Huang understood that the therapy was "for stress" connected to "a recent sexual interaction [appellant] had" along with other family issues, but appellant "never suggested or claimed . . . that his performance issues were related to his mental health treatment." Dr. Huang testified that appellant did not "again mention his therapy or the [sexual] assault after mentioning it . . . in or around April 2021."

Appellant revealed further details to Mr. Blaauw, telling Mr. Blaauw that his (appellant's) brother was undergoing surgical transition, that appellant was in therapy with his parents, and that he had been violently sexually assaulted to such a degree that he had had to be hospitalized. According to Mr. Blaauw, in his discussions with appellant, "mental health was never mentioned," but Mr. Blaauw did describe appellant's "lack of focus or seeming distracted" and "his heart not being in his work." Mr. Blaauw testified that the three personal problems appellant had described to him, which Mr. Blaauw referred to as "intense problems," were added to an "already poor writing ability." The primary issue, according to Mr. Blaauw, was that appellant lacked the ability to "structure an article" and "to build an argument in an article."

Dr. Chien learned about appellant's situation from FAPA staff. Dr. Huang informed Dr. Chien beginning in May 2021 about appellant's "poor work product"

and about "concerns . . . about his attitude" when receiving feedback or instruction. Mr. Blaauw also told Dr. Chien that appellant "was distracted because of . . . events in his life," and Dr. Chien "felt [FAPA staff] needed to keep an eye on" appellant's "not being able to focus on the work" and might need to find an "alternative job within the organization . . . to accommodate him." According to Mr. Blaauw, Dr. Chien's intent in moving appellant to a part-time role was to "give [appellant] less responsibility and enable him to focus more on his work." Mr. Blaauw thought that perhaps FAPA should find a spot in the organization for appellant "beyond the writing obligation, because, clearly, he was not good at that."

Appellant testified that during a meeting with Dr. Chien on August 2, 2021, Dr. Chien asked about appellant's family situation and "what [appellant] was going through in [his] private life." "[I]mmediately after" appellant revealed details regarding the sexual assault, its impact, and why he started therapy, Dr. Chien suggested that appellant move to a part-time role and stated that he was "planning to hire a new staff." However, Dr. Chien also told appellant that he would review the situation in two weeks to see whether appellant could "meet the expectation of

other staff members."[1]  A few days after the meeting, appellant sent an email to Dr. Chien on August 5 that acknowledged "disrupt[ions]" to appellant's mental health but said that they were "under control" and should not "affect the quality of [his] work moving forward."

On August 17, 2021, Dr. Chien reached out to FAPA staff to ask for feedback on appellant's performance during the subsequent two-week period.  Mr. Blaauw responded that he would not be comfortable having appellant work in the Senate: "not now and not in the foreseeable future."  Ms. Huang responded that appellant lacked the experience and skills to assist her in managing the FAPA website.  Dr. Chien testified that in response to this feedback, he determined on August 31, 2021, that appellant should be converted to a part-time contractor.[2]

Mr. Blaauw and Dr. Chien both testified that appellant's performance issues persisted while he worked as a contractor.  Mr. Blaauw determined the quality of appellant's writing was "unacceptable" and that appellant "would not be able to produce any writing, whether letters or speeches or articles, that would be good

---

[1] Appellant testified that he suffered a panic attack immediately after the August 2 meeting.  He did not tell Dr. Chien about the panic attack, and the record contains no evidence that appellant reported the panic attack to other FAPA staff.

[2] According to appellant, however, on August 3, 2021, Dr. Chien had presented him with a contract (that eventually went into effect on September 1, 2021) that halved his number of hours and pay.

enough to put the name of the president of FAPA underneath." When appellant was tasked with mailing out hard copies of the FAPA newsletter, he did not show up for one of the days and Dr. Chien once again received complaints about the quality of his work.

Appellant was terminated from his contractor role at the end of October 2021. Dr. Chien testified that this was because his writing was "not acceptable to be used." Mr. Blaauw testified that Dr. Chien articulated that he decided to terminate appellant because he "could not seem to muster the will or the internal resolve to work for FAPA." FAPA hired a new policy analyst, Jonathan Selling, to start work on October 1, 2021.

After his termination, appellant filed suit, alleging among other things, that FAPA unlawfully converted him to a part-time contractor and then terminated him because he has a disability and because it was perceived that he had a disability.[3] As noted above, the trial court granted summary judgment in favor of FAPA,

---

[3] Appellant's Complaint also alleged unlawful discrimination on the basis of sexual orientation, age, and national origin, and it further alleged a violation of the District of Columbia Wage Payment and Collections Law. The Superior Court dismissed the national-origin claim, the parties stipulated to dismissal of the wage claim, and, in responding to FAPA's motion for summary judgment, appellant stipulated to the dismissal of his claims based on age and sexual orientation.

determining that appellant failed to provide sufficient evidence that he was disabled or that FAPA regarded him as disabled.

This appeal followed. Appellant asserts that the Superior Court failed to view the evidence in the light most favorable to him. He contends that, viewed in that light, the evidence was sufficient to demonstrate that FAPA was put sufficiently on notice of his mental health problems; that FAPA perceived him to be impaired; that FAPA viewed the perceived impairment as substantially affecting his ability to work; and that FAPA's decision to terminate him was due at least in part to his disability. He highlights the evidence that the symptoms of his diagnosed conditions included difficulty organizing his thoughts and also highlights Mr. Blaauw's agreement that his inability to focus was one of the reasons he should leave FAPA. He contends that he asked for, but FAPA failed to provide, reasonable accommodations in the form of clearer expectations from his supervisors.

## II. Applicable Law

We review an order granting summary judgment de novo, applying the same standard the trial court was required to apply when considering a motion for summary judgment. *Bowser v. Dupont E. Civic Action Ass'n*, 300 A.3d 33, 42 (D.C. 2023). "The court shall grant summary judgment if the movant shows that

there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Super. Ct. Civ. R. 56(a)(1). We review the record in the light most favorable to the nonmoving party. *Aziken v. District of Columbia*, 194 A.3d 31, 34 (D.C. 2018). "We may affirm the trial court's ruling on any basis supported by the record if the appellant will suffer no procedural unfairness." *Whiting v. Wells Fargo Bank, N.A.*, 230 A.3d 916, 921 (D.C. 2020).

The DCHRA prohibits an employer from discriminating against an employee "wholly or partially" because of an "actual or perceived . . . disability." D.C. Code §§ 2-1401.11(a)(1), 2-1402.11(a)(1)(A); *see also Hunt v. District of Columbia*, 66 A.3d 987, 990 (D.C. 2013). The prohibition applies if disability "was a significant motivating factor bringing about the employer's decision." *Rose v. United Gen. Contrs.*, 285 A.3d 186, 197 (D.C. 2022) (quoting *Scrivener v. Clark. Coll.*, 334 P.3d 541, 545 (Wash. 2014)). The DCHRA defines the term disability to include "(A) A physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) [a] record of such an impairment; or (C) [b]eing regarded as having such an impairment." D.C. Code § 2-1431.01(4)(A)-(C).[4] To establish a prima facie case of an unlawful termination

---

[4] Appellant does not appear to argue that he actually suffered from "a physical or mental impairment that substantially limits one or more of the major life activities[.]" § 2-1431.01(4)(A). "Under the DCHRA, working is a major life

on the basis of perceived disability, a plaintiff must show that (1) his employer regarded him as having a disability as defined by the statute, (2) he was terminated, (3) at the time he was terminated, he was performing his job at a level that met his employer's legitimate expectations, and (4) the termination occurred under circumstances that raise a reasonable inference of unlawful discrimination. *See Chang v. Inst. for Pub.-Priv. P'ships, Inc.*, 846 A.2d 318, 324 (D.C. 2004). If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory, basis for the termination, which the plaintiff can rebut by showing the employer's reason was pretextual. *Rose*, 285 A.3d at 194-95 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Summary judgment may be granted where the plaintiff fails to show that the non-discriminatory reason(s) proffered by the employer for his termination were a pretext for discrimination. *See Johnson v. District of Columbia*, 225 A.3d 1269, 1282 (D.C. 2020).

---

activity." *Abdul-Azim v. Howard Univ. Hosp.*, 213 A.3d 99, 102 (D.C. 2019). Far from claiming that he had an impairment that substantially limited his ability to work, appellant argued in his opposition to FAPA's motion for summary judgment that he "was performing his job at a level that met his employer's legitimate expectations." We therefore focus on appellant's "regarded as" claim (which we sometimes refer to as his "perceived-disability claim").

## III. Analysis

### A. Our Decision to Forgo a Prima Facie Case Analysis

The Superior Court found that appellant failed to establish prima facie that FAPA regarded him as disabled. Even though FAPA proffered legitimate, non-discriminatory reasons for terminating appellant, the court did not analyze the proffered reasons and did not reach the issue whether appellant had shown sufficient evidence of pretext to get to a jury. The D.C. Circuit has suggested (if not prescribed) that in this circumstance, "the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*" (emphasis in original), but should instead move directly to resolve "one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on [a prohibited basis]?" *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008); *see also id.* at 494-95 (reasoning that where the employer asserted a legitimate, non-discriminatory reason for the challenged employment action, "the question whether [the plaintiff employee] actually made

out a prima facie case is therefore irrelevant").[5]  Our treatment of the issue has not gone as far as the *Brady* proscription, but we, too, have recognized that where (as we conclude *infra* is the case here) a discrimination plaintiff failed to present significant probative evidence to rebut a defendant's proffer of a legitimate, non-discriminatory reason(s) for an allegedly discriminatory personnel action, we need not analyze whether the plaintiff presented a prima facie case.  *See Furline v. Morrison*, 953 A.2d 344, 353 (D.C. 2008) ("[B]ecause [the defendant] produced evidence that it suspended [the plaintiff] for a legitimate, non-discriminatory reason, we need not pause to analyze whether she made out a *prima facie* case of . . . discrimination in opposing summary judgment." (citing *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) ("Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant.")); *see also Cain v. Reinoso*, 43 A.3d 302, 307 n.13 (D.C. 2012).

We shall follow the *Furline* approach by assuming without deciding that appellant established a prima facie case of perceived-disability discrimination.  *See Cain*, 43 A.3d at 308 ("We shall therefore assume for sake of argument that [the

---

[5] *But see Figueroa v. Pompeo*, 923 F.3d 1078, 1087 (D.C. Cir. 2019) (characterizing the statement in *Brady* as a "suggested preference for merits resolution . . . which the District Court should follow only when feasible").

plaintiff] has established her *prima facie* case and address whether, in response, appellees have articulated a 'legitimate, nondiscriminatory basis' for terminating [her] employment[.]"). We elect to do so in part because this approach enables us to avoid addressing an issue the parties have not briefed: whether, in light of the 2008 amendment to the ADA, "a claim of perceived-disability discrimination under the DCHRA can properly rest on a 'perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.'" *Abdul-Azim*, 213 A.3d at 103 (quoting 42 U.S.C. § 12102(3)(A)).

We pause to note why that issue is not a straightforward one. Prior to the 2008 amendments to the ADA, a plaintiff could make a perceived-disability showing as to a personnel action only if he demonstrated both that "(1) he was perceived to have a[n] . . . impairment and (2) the impairment was perceived to substantially limit [his ability to work]." *Lytes v. D.C. Water & Sewer Auth.*, 527 F. Supp. 2d 52, 61-62 (D.D.C. 2007). However, with passage and the January 1, 2009, effective date of the 2008 Americans with Disabilities Act Amendments ("ADAA"), *see Lytes v. D.C. Water & Sewer Auth.*, 572 F.3d 936, 939 (D.C. Cir. 2009), a plaintiff "need only show that [the employer] considered [the plaintiff] to have an impairment—not a substantially limiting impairment." *EEOC v. BNSF Ry. Co.*, 902 F.3d 916, 924 (9th Cir. 2018). *Compare* the pre-ADAA language of 42 U.S.C. § 12102(2) (2008) ("The term 'disability' means, with respect to an

individual—(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; . . . or (C) being regarded as having *such an impairment*." (emphasis added)), *with* the post-ADAA language of 42 U.S.C. § 12102(3)(A) (2009) ("An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment *whether or not the impairment limits or is perceived to limit a major life activity*." (emphasis added)); *see also* 29 C.F.R. pt. 1630 App. (7-1-15 Edition) (hereafter, the "EEOC Interpretive Guidance") at 380 (explaining that under the ADAA, the third prong of the "disability" definition "will require no showing with regard to the severity of his or her impairment"); *id.* at 394 (explaining that "it is not necessary, as it was prior to the ADA Amendments Act, for an individual to demonstrate that a covered entity perceived him as substantially limited in the ability to perform a major life activity in order for the individual to establish that he or she is covered under the 'regarded as' prong"); *Simmons v. Monroe Cty.*, 415 F. Supp. 3d 723, 729 (N.D. Miss. 2019) (noting the new standard following the ADAA is "one of the most plaintiff-friendly standards in all of federal civil litigation."); *Abbott v. Elwood Staffing Servs.*, 44 F. Supp. 3d 1125, 1165 (N.D. Ala. 2014) (recognizing that the ADAA

"was intended to make it easier for plaintiffs to prove they are disabled under the ADA").

Unlike the ADA, the DCHRA has not been amended to modify its "being regarded as having such an impairment" language.[6] *See* D.C. Code § 2-1401.02(5A). Thus, on its face, the DCHRA language would seem to require that a "regarded as" disability claim be premised on a perception that the individual has an impairment that "substantially limits one or more of the major life activities." *Id.* To be sure, this court has repeatedly stated—including in opinions issued after the effective date of the 2008 ADA amendments—that ADA case law and EEOC guidelines (such as those cited in the paragraph above) are persuasive authority for how we should interpret comparable provisions of the DCHRA. *See, e.g.*, *Turner v. D.C. Off. of Human Rights*, 243 A.3d 871, 876 n.2 (D.C. 2021) ("Our decisions under the DCHRA regarding whether an employee was discriminated against because of a 'disability' effectively incorporate judicial construction of related anti-discrimination provisions of the Americans with Disability Act (ADA)." (internal quotation marks omitted)); *Wallace v. Eckert*, 57 A.3d 943, 953 (D.C. 2012) ("This court has considered decisions under the ADA and EEOC guidelines

---

[6] By contrast, following the 2008 amendments to the ADA, the federal Rehabilitation Act, which like the DCHRA, draws its definition of "disability" from the ADA, was explicitly amended to incorporate the ADAA's expanded definition. *Jaiyeola v. District of Columbia*, 40 A.3d 356, 367 n.51 (D.C. 2012).

as persuasive in interpreting comparable provisions of the Human Rights Act."). But in the absence of action by the Council of the District of Columbia to amend the DCHRA definition of "disability" in light of the 2008 amendments to the ADA, and given that the ADA amendments were not merely clarifying but represented changes in the law,[7] we hesitate to hold that a perceived-disability claim may be brought regardless of the perceived severity of the perceived impairment.[8]

## B. Whether Appellant Presented Sufficient Evidence of Pretext

On the assumption that appellant presented the requisite prima facie case, we have next considered whether FAPA presented evidence that it had a legitimate, nondiscriminatory justification for transitioning appellant to a part-time contractor and then terminating him. We have little trouble concluding that FAPA carried

---

[7] *See Lytes*, 572 F.3d at 940 ("If the Congress intended merely to 'clarify' the ADA, then its decision to delay the effective date would make no sense; it would needlessly have left the ADA unclear for the more than three months between enactment of the ADAA on September 25, 2008 and its going into effect on January 1, 2009.").

[8] Which standard applies could be dispositive of whether appellant in this case established a prima facie case of "as-regarded" discrimination. There is record support for appellant's contention that some FAPA staff were aware that the personal problems for which he was in therapy affected his ability to focus on his work, but there appears to be no evidence that anyone at FAPA was aware that appellant had an impairment so debilitating that he was substantially limited in a major life activity.

that burden with respect to the termination. As discussed above, the record contains an array of evidence that appellant's co-workers at FAPA judged him to be a poor writer and complained about his poor attitude. After he was warned that his conduct was unacceptable and he needed to improve, in his co-workers' estimation he did not do so. His work performance did not improve while he was a part-time contractor, and on one occasion, he entirely failed to show up for work. As our case law acknowledges, "poor work performance is a legitimate, non-discriminatory reason to terminate an employee." *Rose*, 285 A.3d at 195.

Thus, the burden shifted back to appellant to show that the reasons proffered by FAPA for his termination were pretextual. To evaluate a claim of pretext—i.e., to determine whether the plaintiff has cast sufficient doubt on the defendant employer's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the proffered legitimate reasons were not what actually motivated the employer's conduct—courts consider whether there are "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [] proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Phillips v. Legacy Cabinets*, 87 F.4th 1313, 1324 (11th Cir. 2023) (quoting *Combs v. Plantation Patterns, Meadowcraft, Inc.*, 106 F.3d 1519, 1538 (11th Cir. 1997)); *see also Capitol Hill Hosp. v. Baucom*, 697 A.2d 760, 766 (D.C. 1997) ("[I]mplausible . . . justifications may (and probably will) be

found to be pretexts for purposeful discrimination." (quoting *Purkett v. Elem*, 514 U.S. 765, 768 (1995))); *Wis. Ave. Nursing Home v. D.C. Com. on Human Rights*, 527 A.2d 282, 290 (D.C. 1987) (concluding that a finding of pretext was supported by the inconsistencies in the employer's documentation of its purported reasons for terminating the complainant); *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015) (explaining that pretext can be shown through, *inter alia*, an employer's "inconsistent or dishonest explanations, its deviation from established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive").

Here, FAPA's proffered legitimate reasons for terminating appellant were his poor writing skills and poor attitude. Appellant has not shown, and the summary judgment record does not reveal, "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions" in those proffered legitimate reasons that a reasonable factfinder could find them unworthy of belief. *See Phillips*, 87 F.4th at 1324. Appellant attempts to undermine FAPA's justification that he was a poor writer by pointing to his educational background and his prior experience as a published writer. But he acknowledged that 90 percent of his articles that were published before FAPA hired him were edited, and he cites no evidence other than his own averments that his FAPA colleagues ever regarded

him as a competent writer and saw "few issues" with the quality of his work. Further, appellant acknowledged (in correspondence with a friend) that he felt he had not "handled relations [at FAPA] that well" and that others at FAPA did not "lik[e] the style of [his] work," and he testified during his deposition that he understood he had rubbed some of the FAPA staff the wrong way.

In an effort to show pretext, appellant points to the fact that FAPA did not put him on a performance improvement plan as described in the FAPA policy manual. *See, e.g.*, *Lathram v. Snow*, 336 F.3d 1085, 1093 (D.C. Cir. 2003) (explaining that an unexplained divergence from customary employment practices can be sufficient evidence of pretext). However, Dr. Chien testified in his deposition that performance plans were "used for [FAPA's] regular employee annual review" and that appellant had not been an employee long enough for FAPA to conduct that review for him, making the annual-review policy inapplicable. Appellant has not shown that this testimony is implausible, and he did not present evidence that FAPA applied its policy in an inconsistent manner.

In an additional effort to support his claim of pretext, appellant emphasizes that the policy analyst who was hired to replace him, Mr. Selling, reportedly did not have any mental health issues. He relies on the decision in *Wheeler v. Georgetown University Hospital*, in which the D.C. Circuit held that evidence that

a black nurse was treated less favorably than similarly situated non-black nurses raised a triable issue of pretext. *See* 812 F.3d 1109, 1115 (D.C. Cir. 2016). However, to support an inference of pretext based on a comparison to how other employees have been treated, a plaintiff alleging unlawful discrimination must show that "all of the relevant aspects of [his] employment situation [were] nearly identical to those of the other employee[(s)]." *Id.* (quoting *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015)); *see also Johnson*, 225 A.3d at 1280-81 (explaining that "[a]n inference of discrimination can be raised by presenting evidence that a 'similarly situated' employee who did not share the protected characteristic engaged in the same conduct, but was treated differently[,]" but "[t]he similarity between the two comparators must exist in all relevant aspects of their respective employment circumstances, which would surely include . . . the alleged misconduct." (internal quotation marks omitted)). Here, there is no evidence in the record that Mr. Selling, like appellant, struggled with his coworkers or was a poor writer, and, taken alone, the fact that Mr. Selling did not report any mental health issues is not sufficient to cast doubt on FAPA's proffered reasons for terminating appellant. "What is lacking in [appellant's evidence] is any showing that [Selling was hired] in spite of shortcomings or transgressions similar to [his] own," *Wallace*, 57 A.3d at 956-57, and any evidence that FAPA treated poorly other employees who were perceived to have mental-health impairments.

We note that there is no procedural unfairness in affirming the dismissal of appellant's disability-discrimination claim on the basis of his failure to present adequate evidence of pretext rather than on the bases on which the Superior Court relied, because appellant briefed the pretext issue in opposing FAPA's motion for summary judgment as well as in his briefs to this court. *See Grimes v. District of Columbia*, 89 A.3d 107, 112 n.3 (D.C. 2014) ("We see no unfairness in affirming on the [stated] ground . . . because Mr. Grimes briefed that issue in this court and in the trial court."). We also note that while appellant asserts that FAPA's decision to demote him to part-time contractor status was based on his disability, he does not appear to argue that he is entitled to relief from the judgment on the basis of his proffered evidence that he was unlawfully demoted during a two-month period. Accordingly, we do not resolve whether his evidence pertaining to the demotion raised a triable issue of perceived-disability discrimination.[9]

---

[9] For the reason noted *supra* in footnote 8 (addressing whether a DCHRA "as-regarded" disability plaintiff must show that the employer perceived the plaintiff as having an impairment so debilitating that he was substantially limited in a major life activity), it may be that, as to a potential claim based on his two-month demotion, appellant failed to make even a prima facie showing that FAPA regarded him as disabled within the meaning of the DCHRA. However, if the DCHRA were interpreted to obviate a showing that the employer perceived the plaintiff to have such a substantially limiting impairment, appellant at least arguably did make the required showing as to his two-month demotion. It is difficult to square FAPA's decision to move appellant to part-time contractor status with FAPA's explanation, in one of its interrogatory responses, that staff regarded

## III.    Conclusion

As appellant failed to come forward with sufficient evidence to enable a reasonable juror to find that FAPA's decision to terminate him was pretextual, his claim that he was unlawfully terminated based on his disability fails as a matter of law.  Accordingly, we affirm the trial court's grant of summary judgment.

*So ordered.*

---

appellant as "unlikely to improve in the near future."  It likewise is implausible that anyone at FAPA thought that appellant's moving to part-time contractor status from full-time employee status would help to resolve his poor writing skills and attitude problems.  The record contains some evidence that the part-time contractor arrangement was chosen because staff "felt it would be harsh to let [appellant] go right away."  But the record also contains evidence that the part-time contractor arrangement was conceived as a sort of (unrequested) "accommodation" to address appellant's "not being able to focus on the work," which (according to Mr. Blauuw) Dr. Chien considered could be related to appellant's "distract[ions] because of . . . events in his life."  Further, while under the ADA, there is an "exception to coverage under the 'regarded as' prong where the impairment on which a prohibited action is based is both transitory (having an actual or expected duration of six months or less) and minor," EEOC Interpretive Guidance at 395, the record evidence is that appellant's symptoms that were triggered by his January 2021 sexual assault continued throughout the year and "intensified from October to December [2021], often leaving him bed ridden."  For all these reasons, a reasonable factfinder possibly could conclude that FAPA demoted appellant because it perceived him to be disabled and did not have a legitimate, non-discriminatory reason for demoting him.